2013-1516, 1517

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INTERNET MACHINES, LLC,

Plaintiff-Cross Appellant,

v.

CYCLONE MICROSYSTEMS, INC.,
PLX TECHNOLOGY, INC.,
EXTREME ENGINEERING SOLUTIONS, INC.,
GE INTELLIGENT PLATFORMS EMBEDDED SYSTEMS, INC.
(also known as General Electric Enterprise Solutions, a Division of General
Electric Company),
NATIONAL INSTRUMENTS CORPORATION,
and VADATECH, INC.,

Defendants-Appellants.

Appeals from the United States District Court for the Eastern District of Texas in
Case No. 10-CV-0023, Judge Michael H. Schneider.

---

## NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLANTS

---

Kevin M. O'Brien
Baker & McKenzie LLP
815 Connecticut Ave., N.W.
Washington, D.C. 20006
(202) 452-7032 (Telephone)
(202) 416-7032 (Facsimile)

Jay F. Utley
Brian C. McCormack
W. Barton Rankin
Baker & McKenzie LLP
2300 Trammel Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 978-3000 (Telephone)
(214) 978-3099 (Facsimile)

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
Internet Machines, LLC v. Cyclone Microsystems, Inc.
Appeal No. 2013-1516, -1517
**CERTIFICATE OF INTEREST**

Counsel for the Appellants, Jay. F. Utley, certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

     PLX Technology, Inc., Cyclone Microsystems, Inc., Extreme Engineering Solutions, Inc., GE Intelligent Platforms Embedded Systems, Inc. (aka General Electric Enterprise Solutions, a Division of General Electric Company), National Instruments Corporation, and Vadatech, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     Cyclone Microsystems, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of Cyclone Microsystems, Inc.'s stock.

     PLX Technology, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

     Extreme Engineering Solutions, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

     GE Intelligent Platforms Embedded Systems, Inc.'s parent corporation is General Electric Company, and General Electric Company is a publicly held corporation that owns 10% or more of GE Intelligent Platforms Embedded Systems, Inc.'s stock. With the exception of General Electric Company, no other publicly held corporation owns 10% or more of GE Intelligent Platforms Embedded Systems, Inc.'s stock.

National Instruments Corporation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Vadatech, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Kevin O'Brien, Jay Utley, Brian McCormack, Kimberly Rich, Bart Rankin, Terry Saad, and Erin Tanner from Baker & McKenzie LLP.  John Bufe from Potter Minton, PC.


Date:  October 7, 2013          Signature of counsel:  /s/ Jay F. Utley _____
                                Printed name of counsel:  Jay F. Utley

## <u>TABLE OF CONTENTS</u>

I.    STATEMENT OF RELATED CASES ........................................1

II.    STATEMENT OF JURISDICTION.......................................1

III.  STATEMENT OF THE ISSUES ......................................1

IV.  STATEMENT OF THE CASE.........................................3

V.    STATEMENT OF THE FACTS ......................................4

    A.    Parties to the Underlying Litigation ......................4

    B.    PLX conceived of the claimed invention first and diligently reduced it to practice. ..............................5

    C.    The Patents-In-Suit were applied for after PLX conceived of and reduced the claimed invention to practice....................................10

    D.    The jury was left to resolve the dispute over the scope of the asserted claims. ..............................12

    E.    Internet Machines sought and obtained royalties on unpatented features. ..............................16

    F.    Defendants moved for a new trial based on Internet Machines' jury tampering....................................20

           The Material Omitted On Pages 21 Through 22 Discloses Internet Machines's Attorney Notes, Witness Outlines, And Comments About Jurors That The District Court Ordered To Be Sealed And Maintained As Confidential ..............................21-22

VI.  SUMMARY OF THE ARGUMENT ..............................22

VII. ARGUMENT..............................26

    A.    A new trial on all issues is warranted because the jury was improperly left to interpret the scope of the asserted claims..............................26

    B.    PLX and its Customers are entitled to judgment as a matter of law, or alternatively, a new trial, on the issue of damages. ..............................30

1. The jury's damages award should be vacated because it was based on a fatally flawed royalty base. ........................................30

2. PLX and its Customers are independently entitled to judgment as a matter of law on damages because Internet Machines' royalty rate was legally insufficient. ...........................................39

C. The Patents-In-Suit are invalid as a matter of law.............................42

1. The Provisional Application is insufficient as a matter of law, and the Patents-In-Suit cannot claim priority to its filing date. ...............................................................................................43

2. Because the Provisional Application is ineffective as a matter of law, the Patents-In-Suit are invalid under 35 U.S.C. § 102(b)...47

3. Even if the Patents-In-Suit claim priority to the Provisional Application, the PLX Webcast is still invalidating prior art under 35 U.S.C. § 102(a). .............................................................49

4. Lastly, even if the Provisional Application and the declarations were deemed effective, the Patents-In-Suit are nonetheless invalid under 35 U.S.C. § 102(g). ...................................................51

D. Because Internet Machines improperly tampered with the jury, a new trial is warranted..........................................................58

The Material Omitted On Page 59 Discloses Internet Machines's Attorney Notes, Witness Outlines, And Comments About Jurors That The District Court Ordered To Be Sealed And Maintained As Confidential......................................................................................... 59

VIII. CONCLUSION AND PRAYER ...................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adams v. Grosbek Indep. School Dist.*, 475 F.3d 688 (5th Cir. 2007) ..............30, 42

*AVM Tech. LLC v. Intel Corp.*, No. 10-610-RGA, 2013 U.S. Dist. LEXIS
    1165 (D. Del. Jan. 4, 2013).................................................................32, 34, 35

*Axcess Int'l, Inc. v. Savi Tech., Inc.*, No. 3:10-CV-1033-F, 2013 U.S. Dist.
    LEXIS 98642 (N.D. Tex. Jan. 25, 2013) ...........................................................32

*Brown v. Reiss*, 436 F.3d 1376 (Fed. Cir. 2006)..........................................49, 50, 52

*Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009)......33

*DSL Dynamic Sci. Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122 (Fed.
    Cir. 1991) ...........................................................................................................57

*Dynetix Design Solutions Inc. v. Synopsis, Inc.*, No. C 11-05973 PSG, 2013
    U.S. Dist. LEXIS 120403 (N.D. Cal. Aug. 22, 2013) ......................32, 33, 34, 35

*Guile v. United States*, 422 F.3d 221 (5th Cir. 2005) .............................................30

*In re Jolley*, 308 F.3d 1317 (Fed. Cir. 2002) ....................................................52, 58

*IP Innovation L.L.C. v. Red Hat, Inc.*
    705 F. Supp. 2d 687 (E.D. Tex. 2010).........................................................31, 37

*LaserDynamics v. Quanta Comp., Inc.*, 694 F.3d 51 (Fed. Cir. 2012)............passim

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997)..................43

*Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301 (Fed. Cir. 2009) ..........30, 32, 39, 40

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).................26

*Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 71 USPQ2d 1837 (Fed. Cir.
    2004) ...................................................................................................................13

*Mirror Worlds LLC v. Apple, Inc.*, 784 F. Supp. 2d 703 (E.D. Tex. 2011),
    *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012)..........................................................passim

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 229 USPQ 805 (Fed. Cir. 1986) .............................................................................. 13

*Network Protection Sciences, LLC v. Fortinet, Inc.*, No. C 12-01106, 2013 U.S. Dist. LEXIS 138890 (N.D. Cal. Sept. 26, 2013) ......................... 35

*Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988) ............................ 58

*Nobelpharma AB v. Implant Innoviations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ...................................................................................... 42

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co, Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008) ................................................................... 26, 27, 29

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006) ......................... 49

*PIN/NIP Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002) .................. 43, 47

*Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004) ...................................................................................... 26

*Refac Elecs. Corp. v. R.H. Macy & Co., Inc.*, No. 84-725, 1988 U.S. Dist. LEXIS 10074 (D.N.J. Sept. 9, 1988), *aff'd*, 871 F.2d 1097 (Fed. Cir. 1989) ................................................................................. 49, 51

*ResQNet.com v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ................ 30, 31, 40, 42

*Scott v. Koyama*, 281 F.3d 1243 (Fed. Cir. 2002) ............................................ 52, 58

*Smith v. Transworld Drilling Co.*, 773 F.2d 610 (5th Cir. 1985) ........................... 58

*Stephens v. S. Atlantic Canners, Inc.*, 848 F.2d 484 (4th Cir. 1988) ................. 59, 60

*Summit 6 LLC v. Research In Motion Corp.*, No. 3:11-CV-367-O, 2013 U.S. Dist. LEXIS 95164 (N.D. Tex. June 26, 2013) ................................... 32

*Teva Pharm. Indus. Ltd. v. Astra-Zeneca Pharms. LP*, 661 F.3d 1378 (Fed. Cir. 2011) ............................................................................ 51, 52

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) ............................. 43, 45, 46

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ....... 31, 32, 33

*United States v. Olano*, 507 U.S. 725 (1993) .......................................................... 59

*Univ. of Rochester v. G.D. Searle & Co.*
    358, F.3d 916, 927 (Fed. Cir. 2004) ............................................................43, 47

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ...................................43

*Verizon Servs. Corp. v. Cox Fibernet Va. Inc.*, 602 F.3d 1325 (Fed. Cir.
    2010) ......................................................................................................47, 48

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

31 C.F.R. § 1.131 ............................................................................................49

28 U.S.C. § 1295(a)(1) ......................................................................................1

28 U.S.C. § 1338 ...............................................................................................1

35 U.S.C. § 102(a) .....................................................................................passim

35 U.S.C. § 102(b) ...............................................................................2, 47, 48

35 U.S.C. § 102(g) ........................................................................2, 25, 51, 58

35 U.S.C. §§ 111(b), 112 ................................................................................43

Fed. R. App. P. 4(a)(4)(B)(i)...........................................................................1

Fifth Circuit, Rule 59 ......................................................................................58

# I.    STATEMENT OF RELATED CASES

There have been no other appeals before this or any other appellate court stemming from the civil action giving rise to this appeal.

# II.    STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of Texas, Tyler Division (the "District Court"), had subject-matter jurisdiction under 28 U.S.C. § 1338.  The District Court entered its final judgment on June 19, 2013.  Appellants filed their notice of appeal on July 17, 2013.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).  *See* Fed. R. App. P. 4(a)(4)(B)(i).

# III.    STATEMENT OF THE ISSUES

1.    If the jury is left to determine the scope of the asserted claims, a new trial is required.  At trial, the parties did not dispute the functionality of the accused products, only the scope of the asserted claims.  The District Court did not resolve the dispute and, in fact, instructed the jury that "so much of your job is going to be claim interpretation."    Reversible error was committed, and a new trial is warranted.

2.    When determining a reasonable royalty, the royalty base must be apportioned to include only the value of the patented feature.  Internet Machines' damages expert considered that apportionment "wasn't a relevant analysis," and used as a royalty base the entire sales price of a product containing over 30 unpatented features but only one feature claimed by the Patents-In-Suit.    The

expert also supported his running royalty rate by improperly relying on licenses between third parties that were entered into eight years before the hypothetical negotiation, that did not involve the Patents-In-Suit, and that included unrelated technology, rights, and obligations. The resulting damages award reliant on the plaintiff's expert's model is not supported by legally sufficient evidence.

3.    The Patents-In-Suit are invalid on multiple grounds. First, the provisional application on which the patents rely is insufficient, and it is uncontroverted that prior art under § 102(b) renders the patents invalid. Second, even if the provisional were sufficient, the same prior art renders the patents invalid under § 102(a) because the inventors failed to submit corroborating evidence of prior conception. Lastly, even if the patents are not rendered invalid under §§ 102(a) or (b), they are invalid under § 102(g)(2) because the evidence demonstrates that PLX conceived of the claimed invention first and diligently reduced it to practice.

4.    Here, for at least three days, *thirty-six pages* of prejudicial attorneys' notes and related materials were left scattered in the jury room in plain sight. These documents contained notes concerning the Defendants, their arguments, scripted testimony for Plaintiff's witnesses, and comments about many of the jurors who were ultimately selected. It is undeniable that the jurors saw these documents, and, to restore integrity to this matter, a new trial is warranted.

2

## IV.    STATEMENT OF THE CASE

On February 2, 2010, Plaintiff, Internet Machines LLC ("Internet Machines"), filed a Complaint for Patent Infringement against, among others, PLX Technology, Inc. ("PLX"), and Cyclone Microsystems, Inc., Extreme Engineering Solutions, Inc., GE Intelligent Platforms Embedded Systems, Inc. (a/k/a General Electric Enterprise Solutions, a Division of General Electric Company), National Instruments Corporation, and Vadatech, Inc. (collectively, the "Customers"). (Corrected Second Am. Compl. for Patent Infringement, A15019-58.) Internet Machines alleged that PLX and its Customers infringed United States Patent Nos. 7,454,552 (the "'552 Patent") and 7,421,532 (the "'532 Patent") (collectively the "Patents-In-Suit") by using or selling PCI Express switches with at least two transparent ports and one non-transparent port. (*Id.*)

A jury trial was conducted between February 21, 2012, and February 29, 2012. After the close of evidence, the jury found that the Patents-In-Suit were valid, and that PLX and its Customers infringed the Patents-In-Suit both directly and by inducement. (Jury Verdict Form at 2-7, A117-22.) The jury also awarded a total of $1,018,529 against PLX and its Customers. (Jury Verdict Form at 6, 8-9, A121, 123-24.)

After the jury's verdict, PLX and its Customers filed renewed motions for judgment as a matter of law and/or for new trial on a number of issues, including

*O2 Micro*, damages, invalidity, and jury tampering.  On June 19, 2013, the District Court granted PLX's Renewed Motion for Judgment as a Matter of Law of No Willful Infringement, but denied all other motions filed by PLX and its Customers. (*Id.*)  On June 19, 2013, the District Court entered its Final Judgment on the jury's findings of validity, and infringement, and damages.  (Final J. at 1-2, A146-47.)

## V.     STATEMENT OF THE FACTS

### A.     Parties to the Underlying Litigation

PLX was founded in 1986, and is an enterprise silicon developer based in Sunnyvale, California.  (*See* Trial Tr. 25:21-26:2, Feb. 24, 2012, Afternoon, A12689-90.)  Since its inception, PLX has been a market leader in I/O interconnect silicon components and complementary software.  In 2001, PLX helped create an industry standard for interconnect devices through its work with an industry group known as the PCI-SIG.  (Trial Tr. 14:20-15:5, 26:22-27:9, 54:13-55:9, Feb. 24, 2012 Afternoon, A12678-79, A12690-91, A12718-19.)  During that time, PLX made a "bet the company" decision to develop, manufacture, and sell semiconductor switches that were compatible with this new standard, known as PCI Express.  (Trial Tr. 24:24-27:18, Feb. 24, 2012 Afternoon, A12688-91.) Through its diligent efforts, PLX beat its competitors to market with the first PCI Express compatible switch, and, at the time of trial, PLX held approximately 70% of the market share for such products.  (Trial Tr. 39:2-21, 41:23-42:5, Feb. 27,

2012 Afternoon, A13025, 13027-28.)    The remaining Appellants are PLX Customers that were sued solely because they purchased PLX switches.

Internet Machines is a non-practicing entity that was formed and assigned the Patents-In-Suit shortly before the underlying lawsuit was filed.  (Trial Tr. 39:7-41:4, Feb. 22, 2012, Morning, A11867-69.)  Internet Machines has three members: Francis Knuettel, Francis Knuettel II, and Steven Sereboff, none of whom are named inventors of the Patents-In-Suit.  (Trial Tr. 37:24-40:7, Feb. 22, 2012, Morning, A11865-68.)  Internet Machines has no employees and has never produced or sold any products.  (Trial Tr. 39:7-41:4, Feb. 22, 2012 Morning, A11867-69.)  The Patents-In-Suit purport to cover PCI Express switches with at least two transparent ports and one non-transparent port.

### B.    PLX conceived of the claimed invention first and diligently reduced it to practice.

In the words of PLX's Vice President of Marketing, Larry Chisvin, in 2001, PLX "bet the company" on its decision to focus its development efforts on the new PCI Express standard.  (Trial Tr. 26:22-27:9, Feb. 24, 2013, Afternoon, A12690-91.)  PLX specifically determined to develop and manufacture PCI Express switches used to connect a host microprocessor with peripheral devices and to manage the corresponding communications among them.  (*See* Defs.' Ex. 145, A16317-20.)  This first line of PCI Express switches became known internally as the "Vega" product line. (Trial Tr. 14:8-18:12, Feb. 24, 2012, Afternoon, A12678-

82.)    As one might expect, their development and manufacture was a time-consuming and expensive effort that would involve approximately 30 engineers and cost tens of millions of dollars.    (Trial Tr. 82:19-83:11, Feb. 24, 2013, Afternoon, A12746-47;   Trial Tr. 31:13-32:6, Feb. 27, 2012, Morning, A12868-69.)

One of the features of these Vega switches that would ultimately be at issue in the underlying lawsuit was the capability of a downstream customer to implement at least two transparent ports and one non-transparent port in his product.    (Trial Tr. 96:24-97:10, 104:20-106:19. Feb. 24, 2012, Afternoon, A12760-61, 12768-70;  Defs.' Ex. 174 pp. 6-20, A16349-63.)  The inventor of that feature was PLX's Chief Technology Officer, Jack Regula.  (Trial Tr. 96:24-97:10, 99:8-102:15, 104:11-112:20, Feb. 24, 2012, Afternoon, A A12760-61, 12763-66, 12768-76;  Defs.' Ex. 174 pp. 6-20, A16349-63.)  Regula specifically prepared and presented, in April 2003, a detailed engineering presentation that disclosed every element of the later-filed asserted claims at issue in the lawsuit (the "Regula Presentation").    (Defs.' Ex. 174 pp. 6-20, A16349-63;   Trial Tr. 31:13-38:6; 102:18-112:20, Feb. 24, 2012, Afternoon, A12695-702, A12766-76;  Defs.' Ex. 174 pp. 6-20, A16349-63.)

In May 2003, shortly after the April 2003 Regula Presentation, PLX decided to add that capability to the Vega line, and PLX's engineers immediately began to

6

work on its implementation.  (Trial Tr. 42:2-47:2, Feb. 24, 2012, Afternoon, A12706-11;    Trial Tr. 6:21-7:21, Feb. 27, 2012, Morning, A128343-44.) Specifically, approximately 30 engineers worked non-stop in four separate teams to write the necessary code, build the hardware, and test the design to ensure that it would work for its intended purposes.  (Trial Tr. 14:4-16:4, Feb. 27, 2012, Morning, A12851-53.)  PLX's efforts to reduce Regula's invention to practice continued nonstop until a fully functioning prototype had been tested and the Vega switches were ready for sale.  (Trial Tr. 80:24-81:13, 123:14-124:13, Feb. 24, 2012, Afternoon, A12744-45, A12787-88;    Trial Tr. 31:2-32:6, Feb. 27, 2012, Morning, A12868-69.)

While PLX's engineers worked continuously, PLX began disclosing to the public that PLX was moving whole-heartedly to PCI Express switches.  For example, in January 2003, PLX issued a press release announcing its development of a "Broad PCI Express Interconnect Family Based on Unique Architecture." (Defs.' Ex. 145, A16317-20;    Trial Tr. 24:5-25:20, Feb. 24, 2013, Afternoon, A12688-89.)  The purpose of this and other press releases was to inform the public that PLX was developing and would bring to the market a PCI Express switch that would include Regula's invention, among many other features.  (Trial Tr. 22:19-23:12, Feb. 24, 2013, Afternoon, A12686-88.)  In Chisvin's words, this was a "bet the company decision," and "we were going to be very loud about what we were

doing." (Trial Tr. 22:19-24:22, 26:3-27:9, Feb. 24, 2013, Afternoon, A12686-88, A12690-91.)

PLX was also vocal about the switches having non-transparent port capability. In June 2003, PLX's Marketing Manager, Danny Chi—also a trained engineer—gave a presentation detailing the capability of the switching products to have two or more transparent ports and one non-transparent port. (Defs.' Ex. 175 pp. 7-18, A16377-88.) The presentation's purpose was to educate PLX's sales staff so that they could adequately inform customers. (Trial Tr. 144:15-145:19, Feb. 24, 2012, Afternoon, A12808-09.)

PLX's efforts to design and bring to market its PCI Express switch were unceasing, and PLX maintained its promotional efforts. In August 2003, PLX issued a press release announcing an online seminar "To Instruct System Design Community on How to Implement PCI Express in Multi-Processor Applications." (Defs.' Ex. 136, A16305-07; Trial Tr. 50:20-51:10, Feb. 24, 2012, Afternoon, A12714-15.) The online seminar, a Webcast entitled "Utilizing Non-Transparent Bridging in PCI Express Base to Create Multiprocessor Systems" (the "Webcast"), was intended to "take system architects, design engineers and engineering managers through the detailed implementation analysis of the next protocol for multiprocessor system designs." (Defs.' Ex. 136, A16305-07.) The Webcast was publicly presented on August 26, 2003, and it included detailed drawings depicting

exactly how the non-transparent port capability would work in PLX's new switching products in conjunction with multiple transparent ports. (Defs.' Ex. 169, A16321-43; Trial Tr. 151:8-156:22, Feb. 24, 2012, Afternoon, A12815-20.)

After the Webcast was presented publicly, PLX unveiled the first physical prototype of its new switching technology in September 2003 at the Intel Developer Forum ("IDF"), which was attended by thousands of industry participants. (Defs.' Ex. 137, A16308-11; Trial Tr. 16:5-17:2, Feb. 27, 2012, Morning, A12853-54.) As PLX's development efforts continued, in December 2003 and March 2004, PLX displayed physical prototypes of its PCI Express switch at PCI-SIG Compliance workshops, both of which were held in Milpitas, California. (Defs.' Exs. 141 & 142, A16312-16.) The physical switch displayed in March 2004 had been fully tested and proven to work for its intended purposes in Sunnyvale, California, including the capability of being configured with at least two transparent ports and one non-transparent port. (Trial Tr. 19:16-28:6, Feb. 27, 2012, Morning, A12856-65.)

From the time of Regula's conception in at least April 2003 through the sale of the first product, PLX's employees and engineers worked virtually every day on this project to ensure that PLX was the first to market. (Trial Tr. 80:24-81:13, 123:14-124:13, Feb. 24, 2012, Afternoon, A12744-45, 12787-88; Trial Tr. 31:2-

32:6, Feb. 27, 2012, Morning, A12868-69.)  To do otherwise would have been

"unthinkable."  (Trial Tr. 80:24-81:13, Feb. 24, 2012, Afternoon, A12744-45.)

### C.     The Patents-In-Suit were applied for after PLX conceived of and reduced the claimed invention to practice.

Both  Patents-In-Suit  claim  priority  to  provisional  application  No.

60/1523,246 (the "Provisional Application") filed on November 18, 2003.  The

Provisional Application's only discussion of the claimed invention is contained in

a single paragraph that merely purports to describe a "PCI Express switch in which

one  or  more  of  the  interfaces  are  optionally  non-transparent."  (Pl.'s Ex. 7 p. 5,

A17236;    Trial  Tr.  26:6-7,  30:19-31:8,  Feb.  27,  2012,  Afternoon,  A13012,

A13016-17.)  One year later, on November 18, 2004, Application No. 10/1993,277

was  filed,  which  would  later  issue  as  the  '552  Patent,  and,  in  January  2004,

Application No. 11/1031,853 was filed, which would later issue as the '532 Patent.

In contrast to the Provisional Application, the utility applications for the Patents-

In-Suit  claimed  a  switch  having  at  least  two  transparent  ports  and  one  non-

transparent  port  with  the  necessary  logic  included  for  routing  data  among  the

specific ports.  ('552 Patent, A134-42;  '532 Patent, A125-33.)

During  the  prosecution  of  the  Patents-In-Suit,  the  USPTO  rejected  both  in

their  entirety  under  35  U.S.C.  §  102(a),  finding  that  the  August  26,  2003  PLX

Webcast,  anticipated  each  and  every  claim  of  the  purported  invention.  (Defs.' Ex.

286 pp. 2-10, A16390-98;  Defs.' Ex. 287 pp. 2-10, A17242-50;  Trial Tr. 100:6-

105:22, Feb. 22, 2012, Morning, A11928-33.)   That finding has never been disputed.   To the contrary, Sereboff, who by this time was a part owner of the applications and was also acting as the prosecuting attorney, had the inventors submit declarations to "swear behind" the PLX Webcast.  (Trial Tr. 105:23-107:10, Feb. 22, 2012, Morning, A11933-35.)

Accordingly, the named inventors submitted declarations, claiming, for the first time, to have conceived of the invention in July 2003.  (Trial Tr. 107:11-110:6, Feb. 22, 2012, Morning, A11935-38.)   But while the inventors signed the declarations, they were drafted by Sereboff and his law firm.  (Trial Tr. 107:11-109:19, Feb. 22, 2012, Morning, A11935-37.)   Similarly, the block diagrams attached to the declarations and relied upon exclusively to corroborate a prior conception date were drafted by Sereboff sometime in 2007 based on conversations with the inventors.  (Trial Tr. 107:11-111:23, 113:7-114:4, Feb. 22, 2012, Morning, A11935-39, A11941-42.)   All other documents submitted to the USPTO post-dated the PLX Webcast.   (Trial. Tr. 114:5-14, Feb. 22, 2012, Morning, A11942.)  Despite the lack of corroborating support for the claimed July 2003 conception date, the Patents-In-Suit were issued on November 18, 2008, and September 2, 2008, respectively.

**D.**   **The jury was left to resolve the dispute over the scope of the asserted claims.**

The asserted claims of the Patents-In-Suit are virtually identical in scope.

Claim 1 of the '552 Patent claims as follows:

> 1. A switch with transparent and non-transparent ports comprising
> a first transparent port for interfacing to a first device having a first address in a first shared address domain
> a second transparent port for interfacing to a second device having a second address in the first shared address domain
> a third port for interfacing to a third device having a third address in a second address domain, wherein the second address domain is isolated from the first address domain
> logic for routing data units between the first transparent port, the second transparent port and the third port using at least one of memory-mapped I/O and I/O-mapped I/O.

('552 Patent, A141.)  Each claim of the '552 Patent requires a switch with two or more transparent ports and at least one non-transparent port.  Both sides' experts agreed that there was no material difference between the Patents-In-Suit.  (Trial Tr. 54:24-55:14, Feb. 27, 2012, Morning, A12891-92.)

During claim construction, the parties disputed the meaning of the term non-transparent port, and the District Court ultimately construed the term to mean "port(s) associated with a non-shared address domain (or domains)."  (Ct.'s Claim Construction Order pp. 16-18, A17181-83.)  Despite that construction, Internet Machines' infringement expert, Charles Narad, testified at deposition that, "there is no requirement in the asserted claims . . . that the accused products have a non-

shared address domain." (PLX's Motion for Clarification pp. 2-4, A13956-58.) In other words, according to Narad, a switch would infringe, even if it did not actually have a non-transparent port—i.e., one associated with a non-shared address domain—as long as it was capable of having such a port. PLX, on the other hand, understood the Court's construction to require that a switch actually be configured to have a non-transparent port, not just be capable of such a configuration, to be "associated with a non-shared address domain." (Trial Tr. 67:11-68:8, Feb. 27, 2012 Morning, A12904-05.)[1] Defendants filed a Motion for Clarification of the Court's Claim Construction Order to bring the issue "to the Court's attention so as to avoid presenting conflicting arguments to the jury and reversible error under *O2 Micro*." (Defs.' Mot. for Clarification p. 1, A13955) The District Court denied the motion and refused to clarify the scope of the asserted claims. (Ct.'s Order on Mot. for Clarification, A13560.)

As Defendants predicted and tried to prevent, competing claim scopes central to the issue of infringement were presented to the jury. For example, Narad testified that the District Court's use of the word "associated" when defining transparent and non-transparent ports was ambiguous and that the claimed switch

---

[1] The transitional term "comprising" is synonymous with "including," "containing," or "characterized by." *See, e.g.*, *Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) ("Comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986).

13

did not actually have to include transparent and nontransparent ports: "[T]he Court used the word associated to simply use its ordinary meaning, *which is sometimes ambiguous*. Associated can mean a group together, it can mean to connect, or it can mean to affiliate, meaning affiliated. . . . So in my mind, it's affiliated with a shared address domain." (Trial Tr. 143:10-21, Feb. 22, 2012, Afternoon, A12127.) (emphasis added.) Under that improperly broad construction, Narad opined that a switch would infringe if it were merely *capable of* being configured to include at least two transparent ports and one non-transparent port. (Trial Tr. 93:4-7, Feb. 23, 2012, Morning, A12250.) Narad testified that a switch would still infringe if it were configured to include only two transparent ports and no non-transparent port at all. (Trial Tr. 51:2-16, Feb. 23, 2012, Afternoon, A12357.)

In contrast, Narad testified that Defendants had a "narrower theory" that required a switch to be *configured* to include at least two transparent ports and one non-transparent port. In particular, the following exchange was elicited by Internet Machines' counsel: "Q: And what's your understanding of PLX's narrower configuration theory of infringement? A: My understanding is that PLX asserts that the preamble of Claim 1 and Claim 11 are not met because the non-transparent port is not configured." (Trial Tr. 91:10-14, Feb. 23, 2012, Morning, A12248.) Narad repeatedly highlighted the competing claim interpretations to the jury:

14

Q:  In – in your opinion that the switches infringe by design, as
specified, as shipped and sold, is any configuration necessary for
infringement?

A:  No.

(Trial Tr. 93:4-7, Feb. 23, 2012, Morning, A12250.)

A:  Okay.  So I want to be very clear on the theory of infringement
that I'm calling PLX's narrower theory.  In order to meet Claim 1,
PLX has asserted that the [non-transparent] port must be configured.

(Trial Tr. 96:3-7, Feb. 23, 2012, Morning, A12253.)

A:  Under PLX's theory, if you only have two enabled ports, the part
would not infringe.

. . .

Q:  Now, under Plaintiff's theory of the case, if only two ports are
enabled and all of the other ports are not enabled, does that switch
infringe Claim 1?

A:  Yes.

(Trial Tr. 51:2-16, Feb. 23, 2012, Afternoon, A12357.)  Thus, the parties' dispute

was not over the function of the PLX switches at issue.  Rather, the parties

disputed the scope of the asserted claims.

The District Court did not resolve that disagreement before sending the case

to the jury.  To the contrary, during the District Court's reading of the jury

instructions, the District Court stated, "Now before we get into all this stuff, we

need to—because so much of your job is going to be claim interpretation and so

I'm going to give you some direction on that, certain levels of interpreting the

claims and in what context." (Trial Tr. 18:6-10, Feb. 28, 2012, Morning, A13083.)

While the District Court did later instruct the jury that "you must accept the meanings I give you," the Court failed to give any further meaning or clarification of the scope of the asserted claims that had been openly disputed for the duration of the trial. Rather, the jury was left to resolve the claim construction dispute, and whether an asserted claim covering a switch that comprises a non-transparent port is infringed by a switch that at no point in its life contains or includes a non-transparent port.

### E.    Internet Machines sought and obtained royalties on unpatented features.

The PLX switches at issue in this matter contain over 30 "key features." (Defs.' Ex. 75, A16301-04.) The accused feature at issue in the underlying litigation was a switch having at least two transparent ports and one non-transparent port. That feature is not among those listed as "key features" in PLX's advertising materials. (*Id.*) At most, those materials list the non-transparent port capability as one of many features, but Internet Machines readily admits that non-transparent port capability was previously known and was not, by itself, covered by the Patents-In-Suit. (Trial Tr. 33:16-35:4, Feb. 23, 2012, Afternoon, A12339-41.)

Moreover, none of PLX's Customers that were named defendants even used the accused feature—i.e., a switch with at least two transparent ports and one non-

transparent port.  (Trial Tr. 113:17-114:6, Feb. 24, 2012, Morning, A12617-18; Trial Tr. 128:15-130:2, Feb. 24, 2012, Morning, A12632-34;  Trial Tr. 141:17-144:3, Feb. 24, 2012, Morning, A12645-48;  Trial Tr. 151:11-152:10, Feb. 24, 2012, Morning, A12655-56;  Trial Tr. 4:13-5:25, Feb. 24, 2012, Afternoon, A12668-69.)  There was also no evidence presented that the accused feature drove customer demand.  To the contrary, all six customers to testify at trial consistently testified that features unrelated to the claimed invention drove their purchasing decisions.  (Trial Tr. 94:7-95:25, Feb. 24, 2012, Morning, A12598-99;  Trial Tr. 113:17-114:6, Feb. 24, 2012, Morning, A12617-18;  Trial Tr. 128:15-130:2, Feb. 24, 2012, Morning, A12632-34;  Trial Tr. 141:17-144:3, Feb. 24, 2012, Morning, A12645-48;  Trial Tr. 151:11-152:10, Feb. 24, 2012, Morning, A12655-56;  Trial Tr. 4:13-5:25, Feb. 24, 2012, Afternoon, A12668-69.)

Despite that evidence, Internet Machines' damages expert, Walter Bratic, used as his royalty base the entire sales price of the PLX switches.  (Trial Tr. 123:15-124:9, Feb. 23, 2012, Afternoon, A12429-30.)  While Bratic agreed that the unpatented features of the switches contributed to their success in the market, (Trial Tr. 51:13-16, Feb. 24, 2012, Morning, A12555), Bratic did not attempt to determine the value of the accused feature or how its value compared to that of the unpatented features.  (Trial Tr. 51:22-52:3, Feb. 24, 2012, Morning, A12555-56.)  Instead, Bratic testified that apportionment "wasn't a relevant analysis."  (*Id.*)

Bratic also testified that he never performed any customer survey or market analysis to determine the value of or demand for the accused feature. (Trial Tr. 51:3-11, Feb. 24, 2012, Morning, A12555.) Bratic merely relied on the erroneous assumption that, because the PLX switch was the "least saleable unit" containing the accused feature, he could use the entire sales price of the switch as a royalty base, regardless of the value of the claimed invention. (Trial Tr. 124:10-125:7, Feb. 23, 2012, Afternoon, A12281-82.) PLX repeatedly objected to the use of such a royalty base, but the District Court denied those objections. (*See e.g.*, PLX's Motion to Strike, A15076-16300.)

Bratic was also permitted to support his royalty rate of 6% by relying on a cross-licensing arrangement among Mobility Electronics, Inc., Cybex Computer Products Corporation, and 2C Computing, Inc. that did not include the Patents-In-Suit, related to different technology, and included multiple other rights, services, and obligations that would not be at issue in the hypothetical negotiation at issue here. The first of these agreements was entered into on March 6, 2000, between Mobility and Cybex. (Pl.'s Ex. 93 at 1, A17200.) Among many other things, the first agreement included a license from Mobility to Cybex of what was defined as the "Mobility Technology." (*Id.* at 2, A17201.) The Mobility Technology included not only unrelated patents and technology, but also rights to software, trade secrets, designs, specifications, existing chips, chips under development,

related intellectual property, and intellectual property associated with the adaptation of certain cables and connectors. (*Id.* at 1-2, A17200-01.) That agreement also included Mobility's covenant not to license the technology to certain other third parties, an arbitration provision, an agreement to jointly develop and sell products, and Cybex's right to sublicense the Mobility Technology. (*Id.*, A17200-12.)

Bratic agreed that none of the foregoing would have been part of any hypothetical negotiation to license the Patents-In-Suit. (Trial Tr. 182:3-187:21, Feb. 23, 2012, Afternoon, A12488-93.) He further testified that he never conducted any analysis to determine the value of these additional items or how they might have impacted the parties' bargaining positions. (Trial Tr. 187:22-188:6, Feb. 23, 2012, Afternoon, A12493-94.) Bratic also failed to determine if a product was ever actually produced or sold pursuant to this agreement or whether any money ever changed hands between the parties. (Trial Tr. 181:14-24, Feb. 23, 2012, Afternoon, A12487.)

The second and third agreements were also materially different from any hypothetical negotiation at issue here for the same reasons as the first agreement. (Pl.'s Exs. 92 & 94, A17188-99, A17213-23.) Bratic similarly testified that they involved many rights and obligations that would not have been at issue in any hypothetical negotiation for the Patents-In-Suit. (Trial Tr. 188:7-192:18, Feb. 23,

2012, Afternoon, A12494-98;   Trial Tr. 34:18-39:24, Feb. 24, 2012, Morning,

A12538-43.)  He also testified that he did nothing to investigate the value of the

other technology, rights, and obligations at issue or whether any money ever

actually changed hands among the contracting parties.  (*Id.*)  While PLX moved to

strike Bratic's opinions based on these agreements before trial and sought to

prevent them from being disclosed to the jury, those objections were denied.  (*See*

Defs.' Motion to Strike, A15076-16300.)  The jury ultimately awarded damages in

the exact amount presented by Bratic, using his inflated royalty base and improper

royalty rate.  (Trial Tr. 123:15-124:9, Feb. 23, 2012, Afternoon, A12429-30;  Jury

Verdict Form pp. 8-9, A123-24.)

### F.    Defendants moved for a new trial based on Internet Machines' jury tampering.

Internet Machines' counsel left *thirty-six pages* of attorneys' notes in the

jury room.  (Trial Tr. 4:12-17:8, Feb. 24, 2012, Morning, A12508-21.)  These

notes remained at most times scattered across the jury's table in the jury room until

the morning of the third day of trial, when the District Court's staff noticed the jury

strike list sticking out from a stack of papers in the middle of the jury table.  (*Id.*)

And when questioned by the Court, each of the jurors admitted that he or she had

seen the documents in the jury room.  (Trial Tr. 20:19-23:24, Feb. 24, 2012,

Morning, A12524-27.)  For example, Juror McGehee stated that she saw the

documents sitting "right in front of me."  (Trial Tr. 20:19-22:23, Feb. 24, 2012,

Morning, A12524-26.)   Juror Penrose stated that the documents "were kind of scattered around at first, and then yesterday [Juror Ward] just stacked them all up." (Trial Tr. 20:19-23:20, Feb. 24, 2012, Morning, A12524-27.)  Juror Ward admitted that she had picked up each one of the documents and put them in a stack in the middle of the table.  (Trial Tr. 20:19-22:6, Feb. 24, 2012, Morning, A12524-26.)

To be clear, the documents that were within plain sight of the jury during half of the trial contained the following prejudicial statements, among others:

THE MATERIAL OMITTED ON PAGES 21 THROUGH 22 DISCLOSES INTERNET MACHINES'S ATTORNEY NOTES, WITNESS OUTLINES, AND COMMENTS ABOUT JURORS THAT THE DISTRICT COURT ORDERED TO BE SEALED AND MAINTAINED AS CONFIDENTIAL.

Because of the inherent prejudice, PLX and its Customers moved for a mistrial, but the District Court denied that motion. (Trial Tr. 19:14-20:6, 25:5-6, Feb. 24, 2012, Morning, A12523-24.) After the close of evidence, the jury returned a verdict finding the Patents-In-Suit valid and infringed and awarded damages to Internet Machines. (Jury Verdict Form pp.8-9, A123-24.)

PLX and its Customers now bring this appeal and respectfully request that the Court vacate the jury's verdict, reverse the final judgment, and render judgment in Defendants' favor in view of these reversible errors.

## VI.    SUMMARY OF THE ARGUMENT

There are numerous grounds on which the jury's verdict should be vacated, the judgment reversed, and judgment rendered, in whole or in part, and/or a new trial ordered. First, the District Court's claim construction provides that, for a switch to infringe, it must have at least two ports associated with a shared address

domain and at least one port associated with a non-shared address domain, i.e., at least two transparent ports and one non-transparent port.  Accordingly, PLX and its Customers argued to the jury that a switch configured with only transparent ports could not infringe because no port would have ever been associated with a non-shared address domain.  On the other hand, Internet Machines argued to the jury that a switch would infringe if it were merely capable of being configured with two transparent ports and one non-transparent port, irrespective of whether the ports are actually associated with shared and non-shared address domains at any point in the life of the product.  Despite PLX's requests, the District Court did not resolve the dispute over the scope of the claims, and the jury was improperly left to decide issues of claim construction.

In addition, Internet Machines' damages expert used the very damages model that another Eastern District of Texas Court rejected less than a year before. *See Mirror Worlds LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 726 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012).  Bratic used as his royalty base the entire sales price of PLX's switches, even though they undisputedly contain over 30 unpatented features that he admits added value to the PLX switches and, indeed, drove customer demand.  Bratic did not apportion the royalty base to account for the value of the unpatented features, and by his own admission, he did not comply

23

with the entire market value rule.  As a result, the law does not support his opinion and any resulting damages award should be vacated as a matter of law.

Bratic's opinion is also fatally flawed because he relied on three agreements that were entered into over eight years before the hypothetical negotiation, did not involve PCI Express switching technology, and included other technology, rights, and obligations, such as software, trade secrets, technical assistance, future enhancements, sublicensing rights, exclusivity provisions, and arbitration clauses, none of which would have been bargained for between the parties to this matter. Because these agreements are materially different from anything that would be at issue in the hypothetical negotiation, they should have been excluded from Bratic's opinion before trial as requested by PLX and its Customers.  But as it stands, the jury's use of Bratic's six percent royalty rate is not supported by legally sufficient evidence, and the jury's damages award should be vacated in its entirety.

Furthermore, the Patents-In-Suit are invalid as a matter of law on numerous grounds.  First, it was uncontroverted at trial that the PLX Webcast that was presented and published publicly on August 26, 2003, anticipated every element of the asserted claims.  And because clear and convincing evidence in the record established that the Patents-In-Suit cannot claim priority to the Provisional Application, and because the inventors did not establish an earlier conception date, the PLX Webcast invalidates the Patents-In-Suit under § 102(a) and/or (b).

Even if the Provisional Application and the inventors' declarations are not deemed insufficient, the Patents-In-Suit are still invalid under § 102(g). The April 2003 Regula presentation discloses each element of the purported claimed invention. In view of that, Internet Machines' own expert agreed that Regula conceived of the claimed invention first. PLX corroborated the diligent reduction to practice of Regula's invention through testimony from numerous witnesses with first-hand knowledge of the development efforts, as well as numerous documents reflecting PLX's work from the time of conception until a fully functioning prototype had been tested for all of the elements in the asserted claims and displayed publicly. Internet Machines presented no evidence or testimony that contradicted those ongoing and diligent efforts. The jury was not at liberty to ignore such an overwhelming amount of evidence, and the Patents-In-Suit are also invalid under § 102(g).

Finally, a new trial is warranted, if necessary, because the jury was exposed for three days to *thirty-six pages* of Internet Machines' attorney notes, jury strike lists, and witness outlines. The highly prejudicial nature of those materials is undeniable, and they undisputedly remained in plain view of all of the jurors for days. The integrity of the proceeding below has been tainted, and, if necessary, this matter should be remanded for a new trial before an unbiased jury.

# VII.   ARGUMENT

## A.    A new trial on all issues is warranted because the jury was improperly left to interpret the scope of the asserted claims.

Under Fifth Circuit law, a district court's denial of a motion for new trial should be reversed if the district court abused its discretion or the determination constituted a misapprehension of the law. *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1307 (Fed. Cir. 2004). In this instance, the District Court's denial constituted a clear misapprehension and application of controlling legal precedent.

Claim construction is a matter of law that must be decided by the judge, not the jury. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Thus, when parties present different arguments to the jury regarding the proper scope of patent claims, the jury is improperly given the task of deciding an issue of claim interpretation, and a new trial is necessary. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co, Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). For example, in *O2 Micro*, the Court held that allowing the jury to decide whether the "only if" limitation contained in the asserted claims allowed for any exceptions impermissibly left jurors with the task of determining the claim's scope. *Id.* at 1362. The Court explained that, while the jury would understand the *meaning* of the words "only if," the district court failed to resolve the parties' dispute with respect to the *scope* of the claim limitation. *Id.* In other words, without a ruling

from the district court on the scope of the term "only if," the jury was left to decide that issue—which is purely an issue of law. *Id.* at 1360 (citing *Markman*, 52 F.3d at 979). Consequently, the Court set aside the jury verdict and remanded the case for a new claim construction decision and a new trial. *Id.* at 1362.

Similarly, in this case, the jury was presented with competing claim scopes. As set forth above, every asserted claim requires a switch with at least two transparent ports and one non-transparent port. The District Court construed transparent and non-transparent ports to mean ports associated with a shared (transparent ports) or non-shared (non-transparent ports) address domain. (Ct.'s Claim Construction Order pp. 13-18, A17178-83.) But Internet Machines' technical expert, Narad, testified at trial that the District Court's use of the word "associated" when construing the terms transparent and non-transparent ports was ambiguous: "[T]he Court used the word associated to simply use its ordinary meaning, *which is sometimes ambiguous.* Associated can mean a group together, it can mean to connect, or it can mean to affiliate, meaning affiliated. . . . *So in my mind, it's affiliated with a shared address domain.*" (Trial Tr. 143:10-21, Feb. 22, 2012, Afternoon, A12127) (emphasis added.) Narad further testified that, under Internet Machines' theory, a switch that was merely capable of being configured to include one non-transparent port and two transparent ports would infringe, regardless of whether the ports were ever actually associated with shared or non-

shared address domains. (Trial Tr. 93:4-7, Feb. 23, 2012, Morning, A12250.) In other words, despite the claim language requiring that the switch comprises a non-transparent port, Narad concluded that the switch does not need to include or contain a non-transparent port.

In contrast, PLX and its Customers took the straightforward position that, for a non-transparent port to be "associated with a non-shared address domain," the switch must be configured to include a non-transparent port. (Trial Tr. 67:11-20, Feb. 27, 2012, Morning, A12904.) PLX's expert testified that, to meet the claim limitations of having at least two transparent ports and one non-transparent port, the switch would need to be configured in that manner. (*Id.*) Otherwise, the switch would not have ports associated with shared and non-shared address domains as required. (*Id.*) This dispute regarding the scope of the asserted claims was repeatedly highlighted by Narad:

> Q: In – in your opinion that the switches infringe by design, as specified, as shipped and sold, is any configuration necessary for infringement?
>
> A: No.

(Trial Tr. 93:4-7, Feb. 23, 2012, Morning, A12250.)

> A: Okay. So I want to be very clear on the theory of infringement that I'm calling PLX's narrower theory. In order to meet Claim 1, PLX has asserted that the NT port must be configured.

(Trial Tr. 96:3-7, Feb. 23, 2012, Morning, A12253.)

The jury was unquestionably given competing views on the scope of the claimed invention.  And when reading the charge to the jury, the District Court stated that "much of your job is going to be claim interpretation and so I'm going to give you some direction on that, certain levels of interpreting the claims and in what context." (Trial Tr. 18:6-10, Feb. 28, 2012, Morning, A13083.)  The District Court at no point clarified for the jury what was meant by the construction "associated with a non-shared address domain."  Rather, the jury was improperly left to resolve that dispute, namely, whether the claims require a non-transparent port, or not.  *See O2 Micro*, 521 F.3d at 1361-63.   Under virtually identical circumstances—if not slightly less egregious than those presented here—the *O2 Micro* Court held that a new trial was required.  *Id.*  The same result is warranted in this matter.

On remand, the Court should instruct the District Court regarding the proper claim construction.  On February 11, 2012, before trial, PLX  filed a Motion for Clarification of the Court's Claim Construction Order under *O2 Micro* in hopes of preventing the error.  (Mot. for Clarification, A13955-14196.)  PLX explained that the plain reading of the construction requires that an accused switch have at least two ports associated with a shared address domain and at least one port associated with a non-shared address domain—not a switch where all the ports are associated with shared address domains or even installed in systems where they could never

be associated with a non-shared address domain. (Mot. for Clarification, A13955-14196.) Indeed, suggesting that the construction does not require address domains, as Narad did before the jury, would effectively strike out the entire substance of the construction: "ports(s) ~~associated with a non-shared address domain (or domains)~~." To prevent further confusion created by Internet Machines' improperly broad view of the asserted claims, PLX and its Customers respectfully request that the Court provide guidance to the District Court consistent with the foregoing.

### B. PLX and its Customers are entitled to judgment as a matter of law, or alternatively, a new trial, on the issue of damages.

Under Fifth Circuit precedent, denial of a motion for judgment as a matter of law is reviewed *de novo*, applying the same standards as the district court. *Adams v. Grosbek Indep. School Dist.*, 475 F.3d 688, 690 (5th Cir. 2007). Under that standard, judgment as a matter of law is appropriate if there is no legally sufficient basis for a reasonable jury to find as the jury did. *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005).

### 1. The jury's damages award should be vacated because it was based on a fatally flawed royalty base.

The patentee has the burden at trial of proving that it is entitled to damages. *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). When seeking a reasonable royalty, a patent owner cannot recover damages on unpatented features. *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir.

2010). Thus, when the claimed invention is but one feature in a product that includes other unpatented features, the patentee has two options: (1) present evidence showing the value of the patented feature alone or, (2) if the patent owner seeks to recover damages based on the entire market value of a product that contains both patented and unpatented features, present sound economic proof that the claimed invention drives customer demand for the entire product. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-19 (Fed. Cir. 2011); *ResQNet.com, Inc.*, 594 F.3d at 872-73; *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010). With respect to the latter, if the patentee fails to present sound economic proof that the claimed invention drives customer demand, any damages award that is based on the entire market value of the accused product, as is the case here, should be vacated. *Uniloc*, 632 F.3d at 1318-19.

Internet Machines used the entire market value of PLX's PCI Express switches as its royalty base, publishing an amount of $16.9 million to the jury. (Trial Tr. 123:15-124:9, Feb. 23, 2012, Afternoon, A12429-30.) It is undisputed, however, that the PLX switches, contain over 30 distinct, unpatented features that are unrelated to the Patents-In-Suit but only one feature that purports to be covered by the claimed invention. (*See, e.g.*, Defs.' Ex. 75, A16301-04). Despite that, Internet Machines' damages expert, Bratic, opined that it was not necessary to comply with the entire market value rule because the PLX switches were the "least

31

saleable unit" containing the claimed invention. (Trial Tr. 124:10-125:7, Feb. 23, 2012, Afternoon, A12430-31.)

In upholding Bratic's royalty base, the District Court held that, despite the existence of unpatented features in PLX's switches, "because Bratic used the smallest salable unit as his base, additional apportionment is unwarranted and the narrow exception of the entire market value rule is inapplicable." (Mem. Op. & Order p. 25, A172.) Appellants respectfully submit that the District Court's determination, as well as other recent opinions from the Northern District of Texas, are incorrect. *But cf. Summit 6 LLC v. Research In Motion Corp.*, No. 3:11-CV-367-O, 2013 U.S. Dist. LEXIS 95164, at *32-37 (N.D. Tex. June 26, 2013); *Axcess Int'l, Inc. v. Savi Tech., Inc.*, No. 3:10-CV-1033-F, 2013 U.S. Dist. LEXIS 98642, at *6-14 (N.D. Tex. Jan. 25, 2013).

When the least saleable unit containing the claimed invention also includes numerous unpatented features, the patentee must still apportion the value of the claimed invention or comply with the entire market value rule. *LaserDynamics v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Uniloc*, 632 F.3d at 1318; *Lucent Techs.*, 580 F.3d at 1324; *Mirror Worlds LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 726 (E.D. Tex. 2011); *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No. C 11-05973 PSG, 2013 U.S. Dist. LEXIS 120403, at *7-12 (N.D. Cal. Aug. 22, 2013); *AVM Tech. LLC v. Intel Corp.*, No. 10-610-RGA, 2013 U.S. Dist.

LEXIS 1165, at *5-10 (D. Del. Jan. 4, 2013). As this Court has held consistently, if the patentee cannot satisfy the entire market value rule, then the patentee "must *in every case* give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Uniloc*, 632 F.3d at 1318 (emphasis added). The holdings in *Cornell University* and *LaserDynamics*, on which Internet Machines and the District Court rely, did nothing to create a new "least saleable unit" exception or relieve patentees from the burden of properly tying the alleged damages to the claimed invention.

Beginning with *Cornell University*, the court in that instance criticized the damages expert for using as a royalty base a product that contained numerous other saleable products. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009). The court further held that the expert should have used as his "*starting point*" the least saleable product that contained the claimed invention. *Id.* at 287 (emphasis added). But the court did *not* hold that the damages expert would be finished with his or her analysis if that product also contained unpatented features. *Id.*; *see Dynetix Design Solutions*, 2013 U.S. Dist. LEXIS 120403, at *9.

Nor did this Court in *LaserDynamics*. When explaining the law, the Court stated that "it is generally required that royalties be based not on the entire product,

but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics*, 694 F.3d at 67. The Court did *not* go on to hold that an exception had now been created to the requirement of apportionment or compliance with the entire market value rule. To the contrary, the Court held that permitting the accused infringer's least salable unit—there a laptop—to be used as the royalty base failed to ensure that the royalty rate applied thereto did not overreach and encompass components not covered by the patent. *Id.* at 70. The Court held that, "when it comes time to then apportion a royalty rate that accounts for the [claimed invention's] contribution only, the exceedingly difficult and error-prone task of discerning the [claimed invention's] value relative to all other components in the laptop remains." *Id.*

More recently, the District of Delaware and the Northern District of California have considered and rejected the exact argument made by Internet Machines. *See Dynetix Design Solutions*, 2013 U.S. Dist. LEXIS 120403, at *7-12; *AVM*, 2013 U.S. Dist. LEXIS 1165, at *5-10. In *AVM*, like Internet Machines here, AVM argued that it was appropriate to use the entire sales price of Intel's microprocessors as a royalty base because that was the smallest saleable product containing the claimed invention, which was a dynamic logic circuit. *AVM*, 2013 U.S. Dist. LEXIS 1165, at *2-7. The District of Delaware held that AVM's royalty base was improper because its expert did not further apportion between the

34

patented and unpatented features contained in the Intel microprocessors or comply with the entire market value rule. *Id.* at *7-10. The court further reasoned, comparing the situation to that in *Lucent*, that "[t]he use of a saleable unit that is greater than the patented feature is going to introduce *Uniloc* error when the patented feature is a 'date picker' whether the saleable unit is a computer loaded with 'Outlook' or simply 'Outlook.' The *Uniloc* error will be greater with the computer loaded with 'Outlook' than with 'Outlook' alone, but the difference in error is one of degree, not of kind." *Id.*

The Northern District of California reached the same conclusion on multiple occasions. *Network Prot. Sci., LLC v. Fortinet, Inc.*, No. C 12-01106, 2013 U.S. Dist. LEXIS 138890, at *17-26 (N.D. Cal. Sept. 26, 2013); *Dynetix Design Solutions*, 2013 U.S. Dist. LEXIS 120403, at *7-12 (holding that because "Dr. Black relied on the blanket assumption that, once he selected the smallest saleable unit—in this case the entire VCS product—he could end the analysis, his determination of the royalty base is fundamentally flawed"). Because it is improper to simply use the entire sales price of a "least saleable unit" as the royalty base when that unit contains unpatented features, as is the case here, Bratic was required to either further apportion or to comply with the entire market rule.

By Bratic's own admission, he did neither. When asked if he engaged in any apportionment to support his analysis, Bratic testified that "it wasn't a relevant

analysis." (Trial Tr. 51:22-52:3, Feb. 24, 2012, Morning, A12555-56.)  But when asked whether he agreed that the other unpatented features in the PLX switches contributed to their success, Bratic responded:  "Oh, absolutely.  I don't deny that." (Trial Tr. 51:13-16, Feb. 24, 2012, Morning, A12555.)

Accordingly, because Bratic's royalty base is the entire value of a product that contains many non-patented features, he was required to show through sound economic proof that the lone claimed feature was the basis for customer demand. But again, Bratic admitted that he did not even attempt to put forth the requisite economic proof.   When asked whether he performed any customer survey to determine what drives customer demand, Bratic testified, "No.  You asked me that question before.  I did not do a customer survey." (Trial Tr. 51:3-9, Feb. 24, 2012, Morning, A12555.)  When asked whether he performed any market analysis for that same purpose, Bratic testified with another, "No." (Trial Tr. 51:3-11, Feb. 24, 2012, Morning, A12555.)

Had Bratic conducted a proper analysis, he would have discovered that his royalty base was unsupportable.  In fact, the PLX customers that testified at trial testified in each and every instance that their decisions to purchase PLX switches were driven by factors unrelated to the claimed invention.  (Trial Tr. 94:7-95:25, Feb. 24, 2012, Morning, A12598-99;   Trial Tr. 113:17-114:6, Feb. 24, 2012, Morning, A12617-18;  Trial Tr. 128:15-130:2, Feb. 24, 2012, Morning, A12632-

34;  Trial Tr. 141:17-144:3, Feb. 24, 2012, Morning, A12645-48;  Trial Tr. 151:11-152:10, Feb. 24, 2012, Morning, A12655-56;  Trial Tr. 4:13-5:25, Feb. 24, 2012, Afternoon, A12668-69.)  Bratic failed in his analysis to account in any way for that real-world evidence.  *See Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 690 (E.D. Tex. 2010) (Rader, J., sitting by assignment) (holding that this type of omission from an expert's opinion reflects an "inattention to the economic and factual data necessary for a reliable assessment of a compensatory royalty").

Despite that uncontroverted testimony, Bratic did contend, and, in fact, the District Court held, in the alternative, that Bratic had presented sufficient evidence that the claimed invention drove customer demand for the PLX switches.  (Ct.'s Mem. Op. & Order p. 26, A173.)  But the only purported evidence in the record that Bratic relies upon is PLX marketing materials, internal PLX e-mails, and testimony from Internet Machines' technical expert, Narad, who readily admits that he is not qualified to give any opinion related to the issue of damages.  (Trial Tr. 23:1-14, Feb. 23, 2012, Afternoon, A12329.)

There are two fundamental errors with Bratic's reliance on those documents and Narad's testimony.   First, the PLX marketing documents and e-mails discuss only the switch's capability of being configured with a non-transparent port, not the claimed invention of a switch with at least two transparent ports and one non-transparent port. (Trial Tr. 128:2-133:3, Feb. 24, 2012, Morning, A12632-37;  *see*

*e.g.*, Defs.' Ex. 75 & Pl.'s Exs. 317 & 326, A16301-04, A17228-29, A17230-31.)

Indeed, Internet Machines' own experts—including Bratic—admit that a non-transparent port is not what is claimed by the Patents-In-Suit. (Trial Tr. 53:11-23, Feb. 24, 2012, Morning, A12557; Trial Tr. 33:16-25, Feb. 23, 2012, Afternoon, A12339.) As a result, those documents cannot constitute sufficient evidence to permit the use of the entire market value. *See Mirror Worlds*, 784 F. Supp. 2d at 726.

Second, those documents do not demonstrate in any way that the claimed invention drives customer demand. This Court explained in *LaserDynamics* that, "[i]f given a choice between two otherwise equivalent laptop computers, only one of which practices [the claimed invention], proof that consumers would choose the laptop computer having the [claimed invention] says nothing as to whether the presence of that functionality is what motivates consumers to buy a laptop computer in the first place. It is this latter and higher degree of proof that must exist to support an entire market value rule theory." *LaserDynamics*, 694 F.3d at 68.

The marketing documents and e-mails relied upon by Bratic discuss, at best, only the value of a non-transparent port, which is not the claimed invention. The marketing documents discuss the non-transparent port capability together with over 30 other features that are unrelated to the Patents-In-Suit. (*See, e.g.*, Defs.' Ex. 75,

A16301-04.)  Further, Narad's own testimony regarding those other features belies any notion that the entire market value rule has been satisfied here.  When asked whether it was important that the PLX switches are backwards compatible with previous standards—a feature unrelated to the Patents-In-Suit—Narad testified: "No one would want it, because it wouldn't be PCI Express compliant if it was not backwards compatible. . . . I wouldn't buy that."  (Trial Tr. 72:23-73:9, Feb. 23, 2012, Afternoon, A12378-79.)

For the reasons set forth above, Bratic's use of the entire sales price of PLX's PCI Express switches as his royalty base was fatally flawed.  And because the jury relied on and used that royalty base to arrive at its damages award, the jury's verdict is not supported by legally sufficient evidence.  *See Lucent Techs.*, 580 F.3d at 1329.  As a result, and because Bratic submitted a methodology that was known to be improper, the jury's damages award should be vacated, and PLX and its Customers are entitled to a judgment as a matter of law on the issue of damages.  *See id.*; *Mirror Worlds*, 784 F. Supp. 2d at 726.  At a minimum and in the alternative, the Court should remand for a new trial on damages, if necessary. *See LaserDynamics*, 694 F.3d at 70-71.

> ### 2.   PLX and its Customers are independently entitled to judgment as a matter of law on damages because Internet Machines' royalty rate was legally insufficient.

Courts are required to exercise vigilance when considering past licenses to

technologies other than the patent-in-suit. *Lucent Techs.*, 580 F.3d at 1329. Agreements that are materially different from the one under consideration in the hypothetical negotiation cannot be relied upon or form the basis for what constitutes a reasonable royalty. *ResQNet.com*, 594 F.3d at 869-70. For example, in *ResQNet.com*, the Court held that licenses that were not for the patents-in-suit and that included other rights and services—such as training, maintenance, re-bundling rights, and marketing—could not be considered to support the damages award. *Id.*

But Bratic testified at trial that he relied on the three "Mobility Licenses" in a cross-licensing arrangement to support his royalty rate of 6% of gross revenue. (Trial Tr. 134:18-137:18, Feb. 23, 2012, Afternoon, A12440-43.) Yet, the Mobility Licenses are materially different from any hypothetical license under consideration here. All were entered into between March and July 2000 (over eight years before the hypothetical negotiation at issue in this litigation), all involved different patents, technology, rights, and obligations than the Patents-In-Suit, and all were between third parties wholly unrelated to the parties to this lawsuit. (Trial Tr. 31:1-32:7, Feb. 24, 2012, Morning, A12535-36.)

For example, the first and third of these three agreements licensed to Cybex and its affiliate Mobility's patents, split-bridge technology, ASIC chips, software, pending patents, trade secrets, related IP blocks, designs, specifications, future

enhancements, modifications, variations thereto, and "all intellectual property associated with the adaptation of cables and connectors adapted for use with Mobility's Split Bridge Chips." (Pl.'s Ex. 93 ¶¶ 2.2, 3.1, A17201-02, Pl.'s Ex. 92 ¶¶ 2.2, 3.1, A17188-89.) The second agreement, entered into by Cybex and Mobility on the same day as the first, licensed to Mobility what was defined as the "Cybex Technology," which included a similarly worded laundry list of technology and rights encompassing much more than just patent rights. (Pl.'s Ex. 94 ¶¶ 2.1, 3.1, A17213-14.)

In addition to the broad array of technology and intellectual property licensed under all three agreements, they also included provisions that, among other things, provided for technical support, joint-development efforts, arbitration agreements, and covenants that the parties would not use certain of the technology and products at issue in the agreements in a particular manner. (Pl.'s Ex. 93 ¶¶ 2.2., 4.2, 5.2, 6.1, 11.2, & 11.5, A17201-09; Pl.'s Ex. 94 ¶¶ 2.1, 4.2, 4.3, 5.2, 6.1, 11.2 & 11.5, A17213-21; Pl.'s Ex. 92 ¶¶ 2.2, 4.2, 5.1, 6.1, 11.2, & 11.5, A17188-97.)

As evidenced by their terms, those agreements are unrelated to and materially different from any agreement contemplated by the hypothetical negotiation at issue in this action. Bratic even testified that none of the technology, rights, or obligations included in the Mobility Licenses would have been bargained

for at the hypothetical negotiation between the parties to this lawsuit. (Trial Tr. 178:15-192:4, 192:7-13, Feb. 23, 2012, Afternoon, A12484-98.)

Accordingly, as this Court has repeatedly held in recent years, it was improper to use the Mobility Licenses to support a royalty rate. *See ResQNet.com*, 594 F.3d at 869-70. Without those, there was no other evidence proffered that would support Bratic's excessive 6% royalty rate, which was unquestionably used by the jury to calculate damages. For that reason alone, the jury's verdict on damages should be vacated, and Defendants should be granted judgment as a matter of law on damages. *See id.*; *Mirror Worlds*, 784 F. Supp. 2d at 726. At a minimum and in the alternative, the Court should remand for a new trial on damages, if necessary. *See LaserDynamics*, 694 F.3d at 70-71.

### C.   <u>The Patents-In-Suit are invalid as a matter of law.</u>

Under Fifth Circuit precedent, a motion for judgment as a matter of law is reviewed *de novo*, applying the same standards as the district court. *Adams v. Grosbek Indep. School Dist.*, 475 F.3d 688, 690 (5th Cir. 2007). Under that standard, judgment as a matter of law should be granted if: (1) the appellants established their case by evidence that the jury would not be at liberty to disbelieve, and (2) the only reasonable conclusion is that the patents are invalid. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998).

    1.    <u>The Provisional Application is insufficient as a matter of law, and the Patents-In-Suit cannot claim priority to its filing date.</u>

A provisional patent application must satisfy the written-description requirement, which requires the applicant to "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991); *see* 35 U.S.C. §§ 111(b), 112. A disclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written-description requirement. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997). Rather, the disclosure must describe the claimed invention *with all its limitations. Id.*; *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998).

While the sufficiency of the written description is a question of fact, whether the written description is inadequate is judged by the four corners of the specification. *See Tronzo*, 156 F.3d at 1158; *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347-48 (Fed. Cir. 2010); *Univ. of Rochester v. G.D. Searle & Co.*, 358, F.3d 916, 927 (Fed. Cir. 2004); *PIN/NIP Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002).

Here, the jury's determination that the Patents-In-Suit are valid is unsupported by legally sufficient evidence. The Provisional Application contains only one paragraph purporting to describe the claimed invention:

> This invention claims a PCI Express switch in which one or more of the interfaces are optionally non-transparent. A device connected to a non-transparent port of the switch is isolated from the address domain of the other ports on the switch. Two or more processors with their own address maps could all communicate with each other through this type of PCI Express switch. The invention claims all memory and I/O address translation schemes for mapping the two domains into each other. These include direct memory translation both with and without offsets, and indirect memory translation through lookup registers or tables. Communication paths through the switch other than address map translation are also claimed by this invention. These include mailbox mechanisms and doorbell registers.

(Pl.'s Exs. 7 & 13, A17232-40, A18240; Trial Tr. 31:5-8, Feb. 27, 2012, Afternoon, A13077.) But this paragraph fails to disclose each claim element for *any claim*, much less all claims, as required.

Specifically, each of the asserted claims expressly requires a switch with at least two transparent ports for interfacing with a first and second device with addresses in a first shared address domain. ('552 Patent claims 1-5, 11-15, A141; '532 Patent claims 1-6, 8-10, A132.) The Provisional Application fails to even mention such ports. There is no disclosure of transparent ports or a first shared address domain. The words "transparent" and "first shared address domain" are never used. And there is likewise no disclosure of the claimed inventions' limitation of at least two transparent ports, as required. Indeed, contrary to the

44

District Court's conclusion that Narad mapped each claim to the Provisional Application, when asked at trial whether the Provisional Application contained those limitations, Narad could not point to anything in the Provisional Application that describes those claim elements.

Rather, Narad merely testified in conclusory fashion that "in the provisional application it[']s called out that switches are inherently transparent devices." (Trial Tr. 8:13-15, Feb. 27, 2012, Afternoon, A12994.)   But for a disclosure to be inherent here, the missing descriptive matter must necessarily have been present in the Provisional Application so that one skilled in the art would recognize such a disclosure.  *Tronzo*, 156 F.3d at 1159.   Yet, there is nothing in the Provisional Application to suggest that the claimed invention would require at least two transparent ports connected to separate devices with different addresses in the same shared address domain.   While one skilled in the art may be aware that some switches have transparent ports, that is certainly not true of all switches, and it does not mean that one skilled in the art would recognize multiple transparent ports as a limitation of the claimed invention, especially when it is not mentioned anywhere in the Provisional Application. *See id.* at 1159-60.   There is absolutely no evidence in the record to support the jury's or the District Court's contrary findings, and as a result, the Patents-In-Suit cannot claim priority to the Provisional Application. *Id.*

The Provisional Application also fails to support the following limitation, which is required for all asserted claims: "logic for routing data units between the first transparent port, the second transparent port and the third port using at least one of memory mapped I/O and I/O mapped I/O." ('552 Patent claims 1-5, 11-15, A141; '532 Patent claims 1-6, 8-10, A132.)  Again, there is no mention of this limitation in the Provisional Application, and Narad could only testify that "switching is what happens in a switch, and further, as Mr. Regula noted, everything done by a switch is done by a combination of logic and storage elements." (Trial Tr. 11:18-25, Feb. 27, 2012, Afternoon, A12997.)

But again, the fact that one skilled in the art may be aware that logic is used to route data between ports on a switch is different from knowing that the claimed invention requires logic for routing data between three specific ports.  There is simply nothing in the Provisional Application that discloses that specific limitation, and there is nothing to support the conclusion that one skilled in the art would know that the invention inherently included a switch with at least two transparent ports and one non-transparent port associated with shared and non-shared address domains, respectively, with logic for routing data among them.

For these reasons, among others, the Provisional Application fails as a matter of law to meet the written-description requirement, and the asserted claims of the Patents-In-Suit cannot claim priority to its filing date.  *See Tronzo*, 156 F.3d at

1158;  *Centocor Ortho Biotech*, 636 F.3d at 1347-48;  *Univ. of Rochester*, 358,

F.3d at 927;  *PIN/NIP*, 304 F.3d at 1243.

>    2.    <u>Because the Provisional Application is ineffective as a
>          matter of law, the Patents-In-Suit are invalid under 35
>          U.S.C. § 102(b).</u>

If a printed publication describing the invention is published more than one

year before the effective filing date of the application, the statutory bar to

patentability of 35 U.S.C.§ 102(b) applies and prevents a valid patent from issuing

on the invention.  The statutory bar is absolute, and therefore renders a purported

earlier date of invention irrelevant.  *Verizon Servs. Corp. v. Cox Fibernet Va. Inc.*,

602 F.3d 1325, 1337 (Fed. Cir. 2010).

The PLX Webcast renders the Patents-In-Suit invalid under §102(b).

Because the Patents-In-Suit are not entitled to the effective filing date of the

Provisional Application, all asserted claims have an effective filing date of no

earlier than November 18, 2004.  ('552 Patent, A141-42;  '532 Patent, A132-33.)

But on August 26 2003, PLX publicly presented and published its Webcast

entitled "Utilizing Non-Transparent Bridging in PCI Express Base to Create Multi

Processor Systems."  (Defs.' Ex. 169, A16321-43, Trial Tr. 151:3-155:25, Feb. 24,

2012, Afternoon, A12815-19.)   The PLX Webcast publicly disclosed every

element of the asserted claims and was supported by numerous drawings depicting

the PLX switches that were under development and would later be accused of

infringement in this matter. (*Id.*; *see also* Defs.' Exs. 286 & 287, A16389-17165, A17241-18329.) PLX's invalidity expert, Dr. Martin Kaliski, performed a detailed element-by-element analysis, demonstrating that each of the asserted claims is disclosed in the PLX Webcast. (Trial Tr. 48:23-59:8, Feb. 27, 2012, Morning, A12885-96.) That opinion was consistent with the USPTO's determination during the prosecution of the Patents-In-Suit that the PLX Webcast anticipated each and every claim of the purported invention. (Defs.' Exs. 286 & 287, A16389-17165, A17241-18329.)[2]

The named inventors at no point disputed the USPTO's findings, and at trial, Internet Machines failed to present any evidence controverting that the Webcast anticipates each and every element of the asserted claims. When Internet Machines' expert was asked by his own counsel whether he performed an analysis of the Webcast in comparison to the claimed invention, he said "No." (Trial Tr. 19:18-21, Feb. 27, 2012, Afternoon, A13005.)

Because the only reasonable conclusion to be drawn from the evidence presented at trial is that the PLX Webcast anticipates all claims of the Patents-In-Suit under § 102(b), the Court should reverse the District Court's judgment and render judgment as a matter of law on invalidity in favor of PLX and its Customers. *See Verizon Servs Corp.*, 602 F.3d at 1337.

---

[2]During the prosecution, the inventors swore behind the Webcast. But as will be explained below, that swear behind was legally insufficient.

3.    Even if the Patents-In-Suit claim priority to the
Provisional Application, the PLX Webcast is still
invalidating prior art under 35 U.S.C. § 102(a).

According to § 102(a), a person is not entitled to a patent if "the invention

was known or used by others in this country, . . . before the invention thereof by

the applicant for patent."  An invention is "known by others" and thus qualifies as

prior art under § 102(a) if it is accessible to the public.  *Ormco Corp. v. Align*

*Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006).  In response to a §102(a)

rejection, the inventor can attempt to "swear behind" the invalidating prior art by

submitting a declaration attesting to a previous conception date and showing a

diligent reduction to practice.  31 C.F.R. § 1.131.  But the declaration must be

supported by evidence other than statements by the inventors.  *See, e.g.*, *Brown v.*

*Reiss*, 436 F.3d 1376, 1380 (Fed. Cir. 2006);  *Refac Elecs. Corp. v. R.H. Macy &*

*Co., Inc.*, No. 84-725, 1988 U.S. Dist. LEXIS 10074, at *16-19 (D.N.J. Sept. 9,

1988), *aff'd*, 871 F.2d 1097 (Fed. Cir. 1989).

During prosecution of the Patents-In-Suit, the USPTO rejected the asserted

claims as anticipated by the PLX Webcast and, thus, invalid under § 102(a).

(Defs.' Exs. 286 & 287, A16389-17165, A17241-18329.)[3]  In response, the named

inventors did not dispute that every element of the asserted claims is, in fact,

---

[3]Because the Examiner did not review the adequacy of the Provisional
Application, the Patents-In-Suit still claimed priority to its filing date.
Accordingly, the rejection was made under 102(a), as opposed to 102(b).

disclosed by the PLX Webcast. (Trial Tr. 105:23-107:10, Feb. 22, 2012, Morning, A11933-35.) Instead, they submitted declarations attempting to show—for the first time—that they had conceived of the claimed invention in July 2003. (Trial Tr. 107:11-110:16, Feb. 22, 2012, Morning, A11935-38.)

To show an earlier conception date, the declarations rely on two drawings submitted for the first time with the declarations. (Trial Tr. 107:11-111:23, 111:7-114:4, Feb. 22, 2012, Morning, A11935-42.) Those drawings were not in existence in July 2003, but rather, were "recreated" at the time the declarations were drafted in late 2007. (Trial Tr. 111:5-9, Feb. 22, 2012, Morning, A11939.) Further, the drawings, are almost identical to those filed with the utility application in November 2004 and were actually created by Steven Sereboff based on conversations with the inventors. (Trial Tr. 110:7-111:23, Feb. 22, 2012, Morning, A11938-39.) Such "evidence" is tantamount to nothing more than inventor testimony that is wholly insufficient to corroborate the prior conception date needed to avoid a § 102(a) rejection. *See, e.g.*, *Brown*, 436 F.3d at 1380. No other evidence was introduced to support an earlier conception date.

Yet, in denying Defendants' motion for judgment as a matter of law on this issue, the District Court found that substantial evidence supported the declaration, and that "Internet Machines provided the documents it submitted to the patent examiner to establish an earlier priority date." (Mem. Op. & Order p. 19, A166.)

But not cite a single document supports an earlier conception date. Similarly, none of Internet Machines' witnesses cited a single document supporting an earlier conception date. In fact, Sereboff admitted that *none* of the "documents submitted to the examiner" were dated before the PLX Webcast. (Trial Tr. 114:5-14, Feb. 22, 2012, Morning, A11942.)

Accordingly, there is no competent evidence in the record to support a prior conception date, and the inventor declarations are legally insufficient as a result. *See Refac Elecs. Corp.*, 1988 U.S. Dist. LEXIS 10074, at *16-19. And because of the clear and convincing evidence that the PLX Webcast anticipates every element of the asserted claims, the Patents-In-Suit are invalid as a matter of law under § 102(a).

4. <u>Lastly, even if the Provisional Application and the declarations were deemed effective, the Patents-In-Suit are nonetheless invalid under 35 U.S.C. § 102(g).</u>

A person is not entitled to a patent if, "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). One way a defendant can prove anticipation under § 102(g)(2) is by establishing prior conception followed by reasonable diligence in reducing the invention to practice. *See Teva Pharm. Indus. Ltd. v. Astra-Zeneca Pharms. LP*, 661 F.3d 1378, 1383 (Fed. Cir. 2011). Conception is the formation in the mind of the inventor of a

definite and permanent idea of the complete and operative invention, as it is [hereafter] to be applied in practice. *In re Jolley*, 308 F.3d 1317, 1321 (Fed. Cir. 2002).

Conception must be followed by reasonable diligence in reducing the invention to practice. *See Teva Pharm.,* 661 F.3d at 1383. In determining an inventor's diligence, "[t]he basic inquiry is whether, on all of the evidence, there was reasonably continuing activity to reduce the invention to practice." *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006). Although an inventor's testimony regarding diligence must be corroborated, it is well-established that, "[u]nlike the legal rigor of conception and reduction to practice, diligence and its corroboration may be shown by a variety of activities." *Id.* "The activities that may be considered in a showing of diligence" are on a "continuum between, on the one hand, ongoing laboratory experimentation, and on the other hand, pure money-raising activity that is entirely unrelated to practice of the [invention]." *Scott v. Koyama*, 281 F.3d 1243, 1248 (Fed. Cir. 2002). Further, corroborating evidence can be documentary, physical or circumstantial evidence, or the oral testimony of someone other than the alleged inventor. *Id; In re Jolley*, 308 F.3d at 1326-29.

PLX's Chief Technology Officer, Regula, was the first to conceive of the complete claimed invention. At trial, PLX entered as evidence a presentation entitled "Non-Transparent Bridge Port on Switch" authored by Regula (the

"Regula Presentation") that evidences his conception of the claimed invention at least as early as April 21, 2003. (Defs.' Ex. 174, A16344-70; Trial Tr. 104:11-105:12, Feb. 24, 2012, Afternoon, A12768-69.) Regula testified in detail how each and every element of the asserted claims was disclosed in the Regula Presentation. (Trial Tr. 105:5-112:20, Feb. 24, 2012, Afternoon, A12769-76.) In addition, Vijay Meduri, who was responsible for implementing Regula's invention, testified in detail how the Regula Presentation included each element of the asserted claims. (Trial Tr. 7:6-14:3, Feb. 27, 2012, Morning, A12844-51.) Similarly, PLX's invalidity expert, Kaliski, performed an analysis of the Regula Presentation and gave his expert opinion that every element of the asserted claims was disclosed therein. (Trial Tr. 59:9-19, Feb. 27, 2012, Morning, A12896.)

Notably, after that evidence was presented, Internet Machines' own technical expert *agreed that Regula conceived of the claimed invention first*: "Q: "Mr. Narad, do you dispute that this was conceived first by PLX? A: I do not." (Trial Tr. 23:6-8, Feb. 27, 2012, Afternoon, A13009.) No contrary evidence was presented at trial, and there can be no credible dispute regarding whether Regula conceived of the claimed invention in April 2003.

There can also be no credible dispute regarding whether PLX diligently reduced the claimed invention to practice. By May 2003, the decision had been made to implement the non-transparent port capability in the PCI Express switches

that were already in development.  (Trial Tr. 42:2-47:2, Feb. 24, 2012, Afternoon, A12706-11.)  Meduri testified that he, along with 30 other engineers, immediately began writing the code to include Regula's invention in the switch design.  (Trial Tr. 6:21-7:21, Feb. 27, 2012, Morning, A12843-44.)

Indeed, four separate engineering teams all worked in parallel in a race to bring the product to market before PLX's competitors—a race that PLX won.  (Trial Tr. 32:20-37:6, 41:23-42:5, Feb. 27, 2012, Afternoon, A13018-23, A13027-28.)  The design team, led by Meduri, was responsible for writing thousands of lines of Verilog code designing and building the structure of the switch, and then converting that code to logic gates, which "run into millions of gates."  (Trial Tr. 33:3-34:4, Feb. 27, Afternoon, A13019-20.)  The verification team then tested the design code and, in doing so, was responsible for writing thousands of lines of code in Vera language.  (Trial Tr. 34:18-36:17, Feb. 27, 2012, Afternoon, A13020-22.)  While the verification team was performing software verification, the emulation team was performing hardware verification and ensuring that everything was married properly to the hardware, and that no bugs existed before sending the product for mass production.  (Trial Tr. 36:18-39:22, Feb. 27, 2012, Afternoon, A13022-25.)  The efforts of each of the engineering teams were ongoing and did not cease until well after a fully functioning prototype had already been tested and

displayed publicly.  (Trial Tr. 41:20-42:14, Feb. 27, 2012, Morning, A12878-79; Trial Tr. 34:21-39:10, Feb. 27, 2012, Afternoon, A13020-25.)

These engineering efforts resulted in a fully functioning switch that had been tested in PLX's U.S. headquarters to practice every element of the claimed invention, and that fully functioning prototype was displayed publicly at an industry workshop in March 2004.  (Trial Tr. 21:18-28:6, Feb. 27, 2012, Morning, A12858-65.)  As Meduri, and numerous others testified, PLX's engineers did not abandon their efforts for any period of time.  (Trial Tr. 41:20-42:14, Feb. 27, 2012, Morning, A12878-79;  Trial Tr. 34:21-39:10, Feb. 27, 2012, Afternoon, A13020-25.)  To the extent there were any delays in the mass production schedule, Meduri made clear that those delays were caused by changes to the PCI Express specification that needed to be accounted for or bugs that needed to be resolved. (Trial Tr. 38:7-39:10, Feb. 27, 2012, Afternoon, A13024-25.)  But any such delays only caused an increase in the work being performed by PLX's engineers to get its "bet the company" project back on schedule.  (Trial Tr. 39:2-10, Feb. 27, 2012, Afternoon, A13025.)

Meduri's testimony regarding these non-stop efforts was corroborated by identical testimony from Chisvin and Regula, both of whom had first-hand knowledge of the work.  (Trial Tr. 80:24-81:13, 123:14-124:13, Feb. 24, 2012, Afternoon, A12744-45, A12787-88.)  Indeed, according to Chisvin, to abandon

that work for any period would have been "unthinkable."  (Trial Tr. 80:24-81:5, Feb. 24, 2012, Afternoon, A12744-45.)   Notably, Internet Machines failed to present or elicit any contrary evidence or controverting testimony.

PLX's diligence also finds ample support in documentary evidence presented at trial.  Beginning immediately after the implementation decision, in June 2003, Chi, PLX's Marketing Manager, and also a trained engineer, gave a presentation that detailed the design of the new switching products being developed by PLX for the purpose of training the sales staff.  (Defs.' Ex. 175, A16371-88;  Trial Tr. 144:15-145:19, Feb. 24, 2012, Afternoon, A12808-09.)

Shortly thereafter, in August 2003, PLX issued a press release entitled "To Instruct System Design Community on How to Implement PCI Express in Multi-Processor Applications."  (Defs.' Ex. 136, A16305-07.)  The purpose of the press release was to promote the PLX Webcast, which was intended to "take system architects, design engineers and engineering managers through the detailed implementation analysis of the next protocol for multiprocessor system designs." (*Id.*)  It is undisputed that PLX publicly presented and published the PLX Webcast in August 2003, a presentation that anticipates each element and limitation of the asserted claims.  (Defs.' Ex. 169, A16321-43;  Trial Tr. 151:3-155:25, Feb. 24, 2012, Afternoon, A12815-19.)

In September 2003, PLX issued a press release announcing that it would display the first working prototype of its new PCI Express switches at IDF—a conference attended by thousands of industry professionals—that same month. (Defs.' Ex. 137, A16308-11;  Trial Tr. 16:15-17:2, Feb. 27, 2012, Morning, A12853-54.)  PLX displayed another more robust prototype at an industry workshop in December 2003, and announced that public display through another press release that same month.  (Defs.' Ex. 141, A16312-14.)

Then in March 2004, PLX issued another press release, announcing that it was displaying yet another, but even more robust, prototype at another industry workshop being held in Milpitas, California, that month.  (Defs.' Ex. 142, A16315-16.)  It is undisputed that the prototype displayed had been tested in Sunnyvale, California, and shown to work for all of its intended purposes, including each element set forth in the asserted claims.  (Trial Tr. 21:18-28:6, Feb. 27, 2012, Morning, A12858-65;)  *see DSL Dynamic Sci. Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122, 1126 (Fed. Cir. 1991).

Internet Machines presented no evidence to contradict PLX's diligence in reducing Regula's invention to practice.  Instead, Internet Machines merely relied on argument from its counsel that PLX could not have been diligent because it did not produce all of the thousands of lines of code and physical prototypes developed at least nine years before the trial of this matter.  But bringing such evidence to

trial would have been duplicative of the materials presented, and is simply not required under any standard of proof for purposes of showing diligence. *Scott*, 281 F.3d at 1248.

Rather, as set forth above, PLX presented a mountain of evidence through witness testimony and documents to demonstrate that PLX did not at any time abandon its development efforts. To find to the contrary would be to disregard the overwhelming, uncontroverted, clear and convincing evidence presented by PLX and its Customers. Because the jury was not at liberty to disregard such evidence, the patents should be found invalid as a matter of law. *See* 35 U.S.C. § 102(g); *In re Jolley*, 308 F.3d at 1329.

### D. <u>Because Internet Machines improperly tampered with the jury, a new trial is warranted.</u>

It is a fundamental principle of law that, although no party is entitled to a perfect trial, all parties are entitled to a fair trial. *See, e.g.*, *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988). According to the Fifth Circuit, Rule 59 "confirms the [trial court's] historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). For example, when a jury considers extraneous material in reaching its verdict, a new trial is necessary if the extraneous material may have reasonably impacted the verdict.

*Stephens v. S. Atl. Canners, Inc.*, 848 F.2d 484, 489 (4th Cir. 1988);  *see United States v. Olano*, 507 U.S. 725, 739 (1993).

It is undisputed that Internet Machines' counsel left attorneys' notes, jury strike lists, and scripted witness testimony in the jury room.  (Trial Tr. 4:12-17:8, Feb. 24, 2012, Morning, A12508-21.)  These prejudicial documents were in plain view of the jury for days.  (Trial Tr. 5:1-10, Feb. 24, 2012, Morning, A12509.)  For example, Juror McGehee stated that she saw the documents sitting "right in front of me."  (Trial Tr. 22:21-25, Feb. 24, 2012, Morning, A12526.)  Juror Penrose stated that the documents "were kind of scattered around at first, and then yesterday [Juror Ward] just stacked them all up."  (Trial Tr. 23:18-20, Feb. 24, 2012, Morning, A12526.)  Juror Ward admitted that she had picked up each one of the documents and put them in a stack in the middle of the table.  (Trial Tr. 22:3-5, Feb. 24, 2012, Morning, A12526.)

To be clear, the documents that were in plain sight of the jury during half of the trial discussed theories of the case, included witness outlines with answers, and included handwritten notes containing the following about jurors that were actually selected:

THE MATERIAL OMITTED ON PAGE 59 DISCLOSES INTERNET

MACHINES'S ATTORNEY NOTES, WITNESS OUTLINES, AND

COMMENTS ABOUT JURORS THAT THE DISTRICT COURT ORDERED TO

BE SEALED AND MAINTAINED AS CONFIDENTIAL.

It is self-evident that referring to a juror as "not suitable" is prejudicial and irrevocably taints the proceeding. To restore the integrity of this matter, a new trial is warranted. *See, e.g., Stephens*, 848 F.2d at 489.

## VIII.  <u>CONCLUSION AND PRAYER</u>

The trial proceeding was contaminated by reversible errors. To summarize, PLX and its Customers respectfully request that this Court make the following determinations, as appropriate, to correct the reversible error committed below:

1.     Hold that a new trial is required because conflicting arguments were presented to the jury regarding the scope of the asserted claims, and instruct the District Court regarding proper claim construction;

2.     Vacate the jury's damages award and grant PLX's and its Customers judgment as a matter of law on the issue of damages, or in the alternative, grant a new trial on the issue of damages;

3.     Vacate the jury's verdict regarding the validity of the Patents-In-Suit and hold the asserted claims invalid as a matter of law under 35 U.S.C. §§ 102(a), (b), and/or (g);  and/or

4.     Hold that a new trial is required because the underlying proceeding was irreversibly tainted by the jury's exposure to Internet Machines' attorneys' notes, witness outlines, and comments about the juror's themselves.

Dated October 7, 2013                    Respectfully submitted,

                                         By:  /s/ Jay F. Utley
                                         Jay F. Utley (Lead Counsel)
                                         jay.utley@bakermckenzie.com
                                         Brian C. McCormack
                                         brian.mccormack@bakermckenzie.com
                                         W. Barton Rankin
                                         bart.rankin@bakermckenzie.com
                                         BAKER & MCKENZIE LLP
                                         2300 Trammell Crow Center
                                         2001 Ross Avenue
                                         Dallas, Texas 75201
                                         Tel.:  (214) 978-7231
                                         Fax:  (214) 978-3099

                                         Kevin M. O'Brien
                                         kevin.obrien@bakermckenzie.com
                                         BAKER & MCKENZIE LLP
                                         815 Connecticut Avenue, N.W., Suite 900
                                         Washington, DC 20006
                                         Tel.:  (202) 452-7000
                                         Fax:  (202) 452-7074

                                         Counsel for Defendants-Appellants
                                         PLX TECHNOLOGY, INC.;
                                         CYCLONE MICROSYSTEMS, INC.;
                                         EXTREME ENGINEERING SOLUTIONS,
                                         INC.;  GE INTELLIGENT PLATFORMS
                                         EMBEDDED SYSTEMS, INC.;
                                         NATIONAL INSTRUMENTS CORP.; and
                                         VADATECH, INC.

# ADDENDUM

# United States District Court
### EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **INTERNET MACHINES LLC** | § | |
| | § | |
| **v.** | § | **Case No. 6:10-cv-23** |
| | § | |
| **ALIENWARE CORPORATION, ET AL.** | § | |

## FINAL JUDGMENT

In accordance with Federal Rule of Civil Procedure 58, the Court enters the following final judgment.

A jury trial was held in the above-styled case from February 21, 2012 to February 29, 2012. The jury reached its verdict on February 29, 2012. *See* Jury Verdict Form, Doc. No. 508. Consistent with the Court's contemporaneously filed Memorandum Opinion and Order, it is **ORDERED** that:

- Defendants PLX Technology, Inc., Cyclone Microsystems, Inc., Extreme Engineering Solutions, Inc., GE Intelligent Platforms Embedded System, Inc., National Instruments Corporation, and Vadatch, Inc. are found to have unlawfully infringed claims 1, 2, 3, 4, 5, 11, 12, 13, 15, and 15 of U.S. Patent No. 7,454,552; and claims 1, 2, 3, 4, 5, 6, 8, 9, and 10 of U.S. Patent No. 7,421,532 (collectively, the Asserted Claims);

- Defendant PLX Technology, Inc. did not willfully infringe the Asserted Claims;

- The Asserted Claims are valid and enforceable;

- Plaintiff Internet Machines LLC is awarded damages against Defendant PLX Technology, Inc. as $980,340.20, against Cyclone Microsystems, Inc. as $1,098.54, against Extreme Engineering Solutions, Inc. as $4,993.92, against GE Intelligent

Add. 1

Platforms Embedded Systems, Inc. as $4,504.32, against National Instruments

Corporation as $7,441.92, and against Vadatech, Inc. as $20,150.10;

- Plaintiff Internet Machines LLC is not awarded attorneys' fees, expert costs, or enhanced damages;

- Plaintiff Internet Machines LLC is awarded post-verdict damages, post-judgment damages, costs of court, prejudgment interest, and post-judgment interest all as detailed in the Court's contemporaneous Memorandum Opinion and Order.

It is additionally **ORDERED, ADJUDGED, and DECREED** that final judgment be entered in this case.

All relief not previously granted is hereby **DENIED**.

**It is SO ORDERED.**

**SIGNED this 19th day of June, 2013.**



MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

**Add. 2**

*ORIGINAL*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| INTERNET MACHINES, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 6:10-CV-23 |
| | § | |
| PLX TECHNOLOGY, INC., CYCLONE | § | |
| MICROSYSTEMS, INC., EXTREME | § | |
| ENGINEERING  SOLUTIONS, INC., | § | |
| GE INTELLIGENT PLATFORMS | § | |
| EMBEDDED SYSTEM, INC., | § | |
| NATIONAL INSTRUMENTS | § | |
| CORPORATION, and VADATECH, INC., | § | |
| | § | |
| *Defendants.* | § | |

## JURY VERDICT FORM

**Add. 3**

## Question No. 1

Do you find that Plaintiff Internet Machines, LLC proved, **_by a preponderance of the evidence_**, that any of the Defendants directly infringe the following patent claims of the '552 patent?

Answer "Yes" (for a finding of infringement) or "No" (for a finding of no infringement) as to each asserted claim in the space provided.  Consider each Defendant separately.  Each space should be answered.

| '552 Patent | PLX Technology, Inc. | Cyclone Microsystems, Inc. | Extreme Engineering Solutions, Inc. | GE Intelligent Platforms Embedded System, Inc. | National Instruments Corporation | Vadatch, Inc. |
|---|---|---|---|---|---|---|
| Claim 1 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 3 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 4 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 5 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 11 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 12 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 13 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 14 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 15 | Yes | Yes | Yes | Yes | Yes | Yes |

Please proceed to Question No. 2.

**Add. 4**

### Question No. 2

Do you find that Plaintiff Internet Machines, LLC proved, *by a preponderance of the evidence*, that any of the Defendants directly infringe the following patent claims of the '532 patent?

Answer "Yes" (for a finding of infringement) or "No" (for a finding of no infringement) as to each asserted claim in the space provided. Consider each Defendant separately. Each space should be answered.

| '532 Patent | PLX Technology, Inc. | Cyclone Microsystems, Inc. | Extreme Engineering Solutions, Inc. | GE Intelligent Platforms Embedded System, Inc. | National Instruments Corporation | Vadatch, Inc. |
|---|---|---|---|---|---|---|
| Claim 1 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 3 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 4 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 5 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 6 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 8 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 9 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 10 | Yes | Yes | Yes | Yes | Yes | Yes |

Please proceed to Question No. 3 *IF AND ONLY IF* you have found at least one claim of the '552 or '532 patents directly infringed by Defendant PLX Technology, Inc. In other words, only proceed to Question No. 3 if you answered "Yes" in any space in Question No. 1 or Question No. 2 for Defendant PLX Technology, Inc. Otherwise, please proceed to Question No. 6.

**Add. 5**

**Question No. 3**

Answer this question *IF AND ONLY IF* you have found at least one claim of the '552 or '532 patents directly infringed by Defendant PLX Technology, Inc.

Do you find that Plaintiff Internet Machines, LLC proved, *__by a preponderance of the evidence__*, that any of the Defendants induce the infringement of the following patent claims of the **'552 patent**?

Answer "Yes" (for a finding of induced infringement) or "No" (for a finding of no induced infringement) as to each asserted claim in the space provided. Consider each Defendant separately.  Each space should be answered.

| '552 Patent | PLX Technology, Inc. | Cyclone Microsystems, Inc. | Extreme Engineering Solutions, Inc. | GE Intelligent Platforms Embedded System, Inc. | National Instruments Corporation | Vadatch, Inc. |
|---|---|---|---|---|---|---|
| Claim 1 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 3 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 4 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 5 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 11 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 12 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 13 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 14 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 15 | Yes | Yes | Yes | Yes | Yes | Yes |

Please proceed to Question No. 4.

**Add. 6**

### Question No. 4

Do you find that Plaintiff Internet Machines, LLC proved, *by a preponderance of the evidence*, that any of the Defendants induce the infringement of the following patent claims of the '532 patent?

Answer "Yes" (for a finding of induced infringement) or "No" (for a finding of no induced infringement) as to each asserted claim in the space provided. Consider each Defendant separately. Each space should be answered.

| '532 Patent | PLX Technology, Inc. | Cyclone Microsystems, Inc. | Extreme Engineering Solutions, Inc. | GE Intelligent Platforms Embedded System, Inc. | National Instruments Corporation | Vadatch, Inc. |
|---|---|---|---|---|---|---|
| Claim 1 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 3 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 4 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 5 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 6 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 8 | Yes | Yes | Yes | Yes | Yes | Yes |
| Claim 9 | Yes | Yes. | Yes | Yes | Yes | Yes |
| Claim 10 | Yes | Yes | Yes | Yes | Yes | Yes |

Please proceed to Question No. 5 *IF AND ONLY IF* you answered "Yes" in any space in Question Nos. 1, 2, 3, or 4 for Defendant PLX Technology, Inc. Otherwise, please proceed to Question No. 6.

**Add. 7**

### Question No. 5

Answer this question ***IF AND ONLY IF*** you have found at least one claim of the '552 or '532 patents infringed by Defendant PLX Technology, Inc.

Do you find that Plaintiff Internet Machines, LLC proved, ***by clear and convincing evidence***, that Defendant PLX Technology, Inc.'s infringement was willful?

Answer "Yes" (for a finding of willful infringement) or "No" (for a finding of no willful infringement) as to each patent.

'552 patent:     Yes

'532 patent:     Yes

Please proceed to Question No. 6.

**Add. 8**

## Question No. 6

Do you find that Defendants proved, ***by clear and convincing evidence***, that the following claims of the '552 or '532 patents are invalid?

If you find the claims invalid, answer "Yes" (for a finding that the claim is invalid), otherwise, answer "No" (for a finding that the claim is not invalid). Answer for all the claims regardless of whether you have found those claims infringed.

| '552 Patent | Invalid? |
|---|---|
| Claim 1 | NO |
| Claim 2 | NO |
| Claim 3 | NO |
| Claim 4 | NO |
| Claim 5 | NO |
| Claim 11 | NO |
| Claim 12 | NO |
| Claim 13 | NO |
| Claim 14 | NO |
| Claim 15 | NO |

| '532 Patent | Invalid? |
|---|---|
| Claim 1 | NO |
| Claim 2 | NO |
| Claim 3 | NO |
| Claim 4 | NO |
| Claim 5 | NO |
| Claim 6 | NO |
| Claim 8 | NO |
| Claim 9 | NO |
| Claim 10 | NO |

Please proceed to Question No. 7 ***IF AND ONLY IF*** you have found at least one claim of the '552 or '532 patents is infringed and that the infringed claim is valid. Otherwise, do not answer Question No. 7. The jury foreperson should instead initial and date this verdict on page 9.

**Add. 9**

<u>**Question No. 7**</u>

     **Answer this question *IF AND ONLY IF* you have found at least one claim both infringed and not invalid.  Only answer the question as to those Defendants you found infringed a claim that is not invalid.  If you did not find infringement by a specific Defendant, do not answer for that specific Defendant.**

     For each Defendant you have found at least one claim both infringed and not invalid, what sum of money, if any, do you find Plaintiff Internet Machines, LLC proved *by a preponderance of the evidence*, if paid now in cash, would fairly and reasonably compensate Internet Machines, LLC for the infringement?

     Consider each Defendant separately.

**For Defendant PLX Technology, Inc.**

     $ _980,340.20_

**For Defendant Cyclone Microsystems, Inc.**

     $ _1,098.54_

**For Defendant Extreme Engineering Solutions, Inc.**

     $ _499392_

**For Defendant GE Intelligent Platforms Embedded Systems, Inc.**

     $ _4504.32_



**Add. 10**

**For Defendant National Instruments Corporation**

$ _____7441.92_____

**For Defendant Vadatech, Inc.**

$ _____20,150.10_____

The foreperson is requested to initial and date this document in the spaces provided below as the unanimous verdict of the jury.

2-29-12
DATE

_____
FOREPERSON INITIAL

**Add. 11**

# United States District Court
### EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **INTERNET MACHINES LLC** | § | |
| | § | |
| **v.** | § | **Case No. 6:10-cv-23** |
| | § | |
| **ALIENWARE CORPORATION, ET AL.** | § | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the parties' post-trial motions. For the reasons stated below, the

Court makes the following rulings on the parties' pending motions:[1]

- Defendants' Renewed Motion for Judgment as a Matter of Law on Damages (Doc. No. 539) is **DENIED**;

- Defendants' Renewed Motion for Judgment as a Matter of Law of Invalidity (Doc. No. 540) is **DENIED**;

- Defendants' Renewed Motion for Judgment as a Matter of Law of No Induced Infringement (Doc. No. 541) is **DENIED**;

- Defendant PLX Technology, Inc.'s Renewed Motion for Judgment as a Matter of Law of No Willful Infringement (Doc. No. 542) is **GRANTED**;

- Defendants' Renewed Motion for Judgment as a Matter of Law of Non-Infringement (Doc. No. 543) is **DENIED**;

- Defendants' Motion for New Trial Based on Jury Tampering (Doc. No. 544) is **DENIED**;

- Defendants' Motion for New Trial Under *O2 Micro* (Doc. No. 545) is **DENIED**;

- Defendants' Motion for Remittitur or, alternatively, New Trial on Damages (Doc. No. 546) is **DENIED**;

---

[1] After the parties completed briefing on their post-trial motions, they notified the Court of a potential merger. The parties indicated that Integrated Device Technology, Inc. (IDT) was in the process of acquiring Defendant PLX Technology, Inc. Because IDT is already a licensee of the asserted patents, the parties noted that the merger would potentially moot all issues. Subsequently, the FTC filed an administrative complaint challenging IDT's proposed acquisition of PLX. Due to the FTC's intervention, the parties terminated the merger. Accordingly, the Court proceeds with addressing the parties' post-trial motions.

## Add. 12

- Plaintiff's Motion for Entry of Judgment (Doc. No. 547) is **GRANTED IN PART**;

- Plaintiff's Motion for Pre and Post-Judgment Interest (Doc. No. 548) is **GRANTED**;

- Plaintiff's Motion for an Exceptional Case Finding, for an Award of Attorneys' Fees and Expert Costs, and for Enhanced Damages (Doc. No. 549) is **DENIED**;

- Plaintiff's Motion for an Award of Post-Verdict Royalties (Doc. No. 550) is **GRANTED IN PART**; and

- Plaintiff's Amended Motion for Award of Costs (Doc. No. 556) is **GRANTED**.

## I.    BACKGROUND

On February 2, 2010, Plaintiff Internet Machines LLC filed this action, alleging, among other things, that Defendants infringed U.S. Patent Nos. 7,454,522 and 7,421,532. In particular, Internet Machines accused Defendant PLX Technology, Inc.'s PCI Express switches of infringing these patents. In response, Defendants contended that the patents were invalid.

On February 29, 2012, following a six-day trial, the jury returned a verdict finding that Defendants infringed all of the asserted claims. The jury additionally found that PLX's infringement was willful. Furthermore, the jury did not find any of the asserted claims invalid. Accordingly, the jury awarded Internet Machines damages totaling $1,018,529.00.[2]

## II.    LEGAL STANDARD

A motion for judgment as a matter of law is a procedural issue not unique to patent law; therefore, the motion is reviewed under the law of the regional circuit. *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). Judgment as a matter of law is justified

---

[2] Specifically, the jury calculated damages against PLX as $980,340.20, against Cyclone Microsystems, Inc. as $1,098.54, against Extreme Engineering Solutions, Inc. as $4,993.92, against GE Intelligent Platforms Embedded Systems, Inc. as $4,504.32, against National Instruments Corporation as $7,441.92, and against Vadatech, Inc. as $20,150.10.

where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In addressing a motion for judgment as a matter of law, the Court must "review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." *Ellis v Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The basis for this perspective is that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Reeves*, 530 U.S. at 150.

Thus, a motion for judgment as a matter of law should be granted "only when 'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'" *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 405 (5th Cir. 2007) (quoting *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004)). The court affords "great deference to a jury's verdict" and a judgment as a matter of law is only appropriate "when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838 (5th Cir. 2004).

In regard to granting a new trial, the Court, in its discretion, may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). As with motions for judgment as a matter of law, motions for new trial are determined by the law of the regional circuit. *z4 Techs., Inc. v.*

# Add. 14

*Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). Grounds for a new trial include that "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). The Court must affirm the jury's verdict unless, in viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of the other party that reasonable individuals could not arrive at a contrary conclusion. *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (per curiam).

## III.    DISCUSSION

### A.  Defendants' Renewed Motion for Judgment as a Matter of Law of Non-Infringement (Doc. No. 543)

This motion is **DENIED**.

Defendants argue that Internet Machines provided no evidence of direct infringement at trial and, therefore, judgment as a matter of law is justified.

"To prove infringement, a plaintiff must prove the presence of each and every claim element or its equivalent in the accused method or device." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011). Infringement is a two-step test. The first prong requires that "the claim must be properly construed to determine its scope and meaning." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). Next, "the claim as properly construed must be compared to the accused device or process." *Id.* Since infringement is a fact question, it is reviewed for substantial evidence. *Star*, 655 F.3d at 1378.

First, Defendants maintain that Internet Machines repeatedly misapplied the Court's claim construction during trial. According to Defendants, Internet Machines explained that a "non-transparent port" is a port "for interfacing to devices . . . with non-shared address domains" rather than adhering to the Court's defined construction of "port(s) associated with a non-shared

address domain (or domains)" (Afternoon Trial Tr. 147:22–23, Feb. 22, 2012, Doc. No. 515). Defendants argue that the Court's construction requires the presence of physical ports while Internet Machine's application only requires the capability of having physical ports in the future. Defendants conclude there is no basis for the jury's infringement finding because Internet Machines failed to establish that any accused product includes a switch with at least one non-transparent port associated with a non-shared address domain.

Defendants point out that at several points in the trial, Internet Machines used the "interfacing" terminology in explaining non-transparent ports. But Internet Machines presented this evidence to explain the function of a port. Internet Machines also separately addressed whether the accused switches included a non-transparent port associated with a non-shared address domain. Internet Machines' technical expert Charles Narad provided detailed testimony connecting the Court's construction and all claim limitations to the accused products.

Defendants also argue that Internet Machines failed to prove that the accused switches included both transparent and non-transparent ports. Yet, Mr. Narad provided testimony in direct contradiction to this argument. For example, Mr. Narad explained how the data books containing the switches' technical specifications supported his analysis that the accused products contained at a minimum two transparent ports and one non-transparent port. Mr. Narad also relied upon information provided by PLX engineers, including Vijay Meduri, for his conclusions that the switches contained all elements of the claims, including the required ports, at the time of manufacture.

Defendants additionally assert that the accused switches require configuration in order to be infringing. According to Defendants, the switches only have transparent ports when they are shipped or sold. Because all asserted claims require at least two transparent ports and one non-

transparent port, Defendants conclude there can be no infringement. Internet Machines responds that it presented substantial evidence that the switches contained all elements of the asserted claims.

At trial, Mr. Narad testified that all of the logic and structures for transparency and non-transparency—including the necessary registers—exist at each port of the accused switches at the time of manufacture. Mr. Narad presented evidence that the registers exist on the switches from their inception. Mr. Narad explained that the exposure of a subset of the registers at the ports determines their transparency. Thus, Mr. Narad concluded the accused switches require no configuration for infringement in part because the registers are always present on the switches.

Ultimately, substantial evidence supports the jury's infringement finding. The jury was free to consider all of the evidence and reject Defendants' non-infringement theory in favor of Internet Machines' infringement evidence. Internet Machines provided substantial evidence that the accused products, in light of the Court's claim construction, infringe without any additional configuration. Because the jury's infringement finding is supported by substantial evidence, judgment as a matter of law of non-infringement is unwarranted.

## B. **Defendants' Renewed Motion for Judgment as a Matter of Law of No Induced Infringement (Doc. No. 541)**

This motion is **DENIED**.

Defendants allege that Internet Machines did not carry its burden at trial for its induced infringement claim. Because infringement is a factual determination, a jury's finding is reviewed for substantial evidence. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009).

As set forth in the Patent Act, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to prevail on an inducement claim, the

## Add. 17

patentee must establish 'first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'" *ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)).

The intent element is satisfied where an infringer had "knowledge that the induced acts constitute patent infringement" or was willfully blind to any infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068–69 (2011). Intent can be proved by either direct or circumstantial evidence. *See Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005). Importantly, "[i]ntent is a factual determination particularly within the province of the trier of fact." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

Here, substantial evidence supports the jury's verdict of induced infringement as to all Defendants. Internet Machines provided considerable evidence in support of direct infringement. Furthermore, Defendants had actual notice of the patents at least as early of the filing of this suit. Internet Machines presented sales data establishing that Defendants continued to sell the accused products to their customers through the time of trial. As a minimum, Defendants had knowledge of the asserted patents when they engaged in the post-filing sales. This is substantial evidence of inducement.

Internet Machines showed that Defendants encouraged the configuration and use of the infringing feature. Internet Machines provided evidence that the patented feature drove sales. According to Internet Machines, the patented feature was essential to the accused products. Internet Machines also established that Defendants advertised the patented feature and provided

customer support for its operation. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) ("Evidence of 'active steps . . . taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use . . . .") (quoting *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 992 (N.D. Ill. 1988); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004); *VirnetX Inc. v. Apple Inc.*, No. 6:10-cv-417, 2013 WL 692652, at *9 (E.D. Tex. Feb. 26, 2013) (upholding jury's inducement finding because the defendant instructed its customers to use the accused features in an infringing manner); *Advanceme Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 627 (E.D. Tex. 2007). Based upon all of the facts and evidence, the jury could reasonably infer the requisite intent for inducement.

In light of the evidence presented at trial, a reasonable jury could find that Defendants induced their customers to infringe. The Court will not disturb the jury's findings on this issue because it is supported by substantial evidence.

### C. <u>Defendant PLX Technology, Inc.'s Renewed Motion for Judgment as a Matter of Law of No Willful Infringement (Doc. No. 542)</u>

This motion is **GRANTED**.

PLX challenges the jury's finding of willful infringement. Specifically, PLX contends that Internet Machines did not present clear and convincing evidence that PLX willfully infringed the asserted patents.

Willful infringement requires a two-part test. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed.

Cir. 2007) (en banc). "The state of mind of the accused infringer is not relevant to this objective inquiry." *Id.* Second, "[i]f this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* The jury's determination of the subjective prong is reviewed for substantial evidence. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012).

Since the time of trial in this case, the Federal Circuit has clarified that the first prong—the objective prong—is determined as a matter of law. *Id.* ("[T]he ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge."). "Based on the record ultimately made in the infringement proceedings," the Court should determine "'whether a reasonable litigant could realistically expect' those defenses to succeed." *Id.* (quotations omitted).

In this case, the Court finds neither prong of the willfulness test satisfied.

### 1. *Willful Infringement—Objective Prong*

PLX argues that Internet Machines failed to present any evidence that PLX acted despite an objectively high likelihood that its actions amounted to infringement of a valid patent. The Court agrees.

In considering the fully developed record, the Court does not find the objective prong of the willfulness test satisfied. Based on the record developed during trial, PLX could have realistically expected its non-infringement and invalidity defenses to succeed.

Internet Machines argues that PLX's non-infringement position is not objectively reasonable as a matter of law. Internet Machines maintains that PLX's non-infringement theory was clearly deficient because Defendants' technical expert Dr. Martin Kaliski did not review any technical documents, and therefore, had no technical basis for his non-infringement opinions. Although Internet Machines attacks the foundation for PLX's position, this has no impact on the reasonableness of PLX's non-infringement argument. PLX argued that its switches required configuration to be infringing. The Court does not find this to be an unreasonable position.

Internet Machines additionally contends that PLX's invalidity defense is objectively unreasonable as a matter of law. According to Internet Machines, PLX's anticipation argument and PLX's prior invention theories were objectively meritless.

Regarding anticipation, the patent examiner initially rejected the claims in light of PLX's webcast. To predate the webcast, Internet Machines filed an inventor declaration and supporting documentation. At trial, PLX challenged the adequacy of the inventor's declaration to predate the webcast. PLX even introduced evidence that the patent examiner did not adequately review the declaration. PLX also attacked the provisional application as insufficient for priority purposes because it lacked an adequate disclosure of the later-claimed invention. Although PLX's anticipation arguments were ultimately unavailing, they were objectively reasonable.

Pertaining to prior invention, PLX argued that it first conceived of the invention and diligently reduced the invention to practice. Accordingly, PLX concluded the patents were invalid under 35 U.S.C. § 102(g). Internet Machines responds that PLX's prior invention claim is untenable. Yet during trial, Internet Machines' technical expert Mr. Narad testified that PLX's Chief Scientist Jack Regula first conceived the claimed invention. Although Internet Machines

challenges the context of Mr. Narad's testimony, it created an objectively reasonable basis for PLX's invalidity argument.

Internet Machines also refutes PLX's diligent reduction to practice argument as objectively unreasonable. However, PLX corroborated diligence with engineering presentations, internal emails, press releases, and the webcast. Because PLX did not produce voluminous amounts of supporting technical documents, Internet Machines discredits PLX's reasonable expectation of success of this theory. Even though Internet Machines takes issue with the types of corroborating evidence produced by PLX, PLX produced credible evidence to support its diligence in reducing the invention to practice.

On balance, PLX presented in good faith credible and objectively reasonable non-infringement and invalidity arguments. As a matter of law, there was not an objectively high likelihood that PLX's actions constituted infringement of a valid patent. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) ("'[W]here an accused infringer relies on a reasonable defense to a charge of infringement,' the objective prong tends not to be met." (quoting *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305,1319 (Fed. Cir. 2010)). Internet Machines has not proven by clear and convincing evidence the threshold objective prong of *Seagate.*

### 2.  Willful Infringement—Subjective Prong

Furthermore, the record contains insufficient evidence to support the jury's subjective willfulness finding. *Bard*, 682 F.3d at 1008 ("If, in view of the facts, the asserted defenses were not reasonable, only then can the jury's subjective willfulness finding be reviewed for substantial evidence."). Under the subjective prong, Internet Machines needed to establish by clear and convincing evidence that PLX knew or should have known of the risk that its conduct infringed

## Add. 22

Internet Machines' patents. *See Seagate*, 497 F.3d at 1371. The Court applies a subjective evidence standard of review. *Bard*, 682 F.3d at 1008.

The parties differentiate between pre-filing and post-filing conduct. The Court finds that the record as a whole is insufficient to establish the subjective prong as to pre-filing conduct.[3]

At trial, Internet Machines presented no evidence that prior to filing of this action, PLX knew or should have known that its actions constituted infringement. Frank Knuettel, one of the owners of Internet Machines, testified that his company never contacted Defendants regarding any infringement prior to initiating this suit. Internet Machines does not contest this point. No evidence supports the claim that PLX had any knowledge from any other source that the patents existed.[4] This is not a case where PLX copied the technology from another or disregarded information that another owned the technology. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1336 (Fed. Cir. 2009) (explaining that "evidence of copying in a case of direct infringement is relevant only to *Seagate*'s second prong, as it may show what the accused infringer knew or should have known about the likelihood of its infringement").

Lastly, Internet Machines argues that PLX attempted to conceal its knowledge of downstream use and configuration by its customers. Even if true, knowledge of downstream use alone is not equivalent to knowledge that the downstream use is infringing. Internet Machines provided no evidence to show that PLX knew or should have known that the downstream use was infringing conduct.

---

[3] PLX's post-filing knowledge is protected by the reasonable defenses it presented in good faith.
[4] The Court maintains grave concerns about Internet Machines' compliance with the pleading requirements. Internet Machines' original complaint clearly contains allegations of willful infringement. *See Seagate*, 497 F.3d at 1374 ("[A] willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct."). But Internet Machines alleged no facts to support pre-filing willful infringement by PLX. *See id.* ("[W]hen a complaint is filed, a patentee must have a good faith basis for alleging willful infringement.").

Internet Machines failed to present any evidence, let alone substantial evidence, that PLX knew or should have that its pre-filing conduct amounted to infringement. In total, the jury's finding that PLX willfully infringed the asserted patents is unsupported. Accordingly, PLX's motion for judgment as a matter of law of no willful infringement is meritorious and should be granted. The Court directs the entry of judgment as a matter of law that PLX did not willfully infringe either the '552 or '532 patents.

### D. **Defendants' Renewed Motion for Judgment as a Matter of Law of Invalidity (Doc. No. 540)**

This motion is **DENIED**.

Defendants present several invalidity theories, including prior invention, inadequate disclosure, inadequate inventor declaration under 37 C.F.R. 1.131, and obviousness. The Court disagrees with Defendants' arguments and addresses each in turn.

#### 1. *Prior Invention*

Defendants' first argue that PLX is a prior inventor of the asserted technology under 35 U.S.C. § 102(g)(2). Under § 102(g)(2), PLX must show by clear and convincing evidence its prior invention by establishing that "(1) it reduced its invention to practice first . . . or (2) it was the first party to conceive of the invention and then exercised reasonable diligence in reducing that invention to practice." *Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001). "[T]he test for conception is whether the inventor had an idea what was definite and permanent enough that one skilled in the art could understand the invention . . . ." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). "In order to establish reduction to practice, the prior inventor must have (1) constructed an embodiment or performed a process that met all the claim limitations and (2) determined that the invention would work for its

intended purpose." *Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*, 661 F.3d 1378, 1383 (Fed. Cir. 2011).

The parties dispute whether PLX's Chief Scientist Jack Regula first conceived of the claimed invention. The parties further dispute whether PLX engineers diligently reduced the invention to practice after Mr. Regula's alleged conception.

PLX argues that at trial it presented uncontroverted evidence regarding its prior invention. Specifically, Mr. Regula testified and presented evidence of his conception of the invention by at least April 21, 2003. PLX further notes that Internet Machines' technical expert Mr. Narad agreed that PLX first conceived the invention. Additionally, PLX employees Mr. Meduri and Larry Chisvin testified that Mr. Regula and at least 30 PLX engineers worked continuously and diligently and reduced the invention to practice by March 2004. PLX states that it presented a number of documents at trial in support of its position. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) (explaining that it is well-established law that a claim of prior inventorship must be supported by corroborating evidence). According to PLX, the documents include engineering presentations, white papers, webcasts, and press releases. Because Internet Machines claims an invention date of August 25, 2003, or at the latest by the filing of the provisional application on November 18, 2003, PLX concludes it was the first to invent.

Regarding diligence, Mr. Meduri admitted during trial to a several month delay in the development process. *See Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312–13 (Fed. Cir. 2011) ("Merely asserting diligence is not enough; a party must 'account for the entire period during which diligence is required.'" (quoting *Gould v. Schawlow*, 363 F.2d 908, 919 (C.C.P.A. 1966))). Furthermore, Mr. Meduri testified that diligence in reducing the invention to

practice would have generated a mass of engineering documents, including architecture specifications and microarchitecture specifications. But Mr. Meduri confirmed that none of these documents were brought to trial. *See Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997) (reasoning that the purpose behind requiring corroborating evidence "is to prevent fraud, by providing independent confirmation of the inventor's testimony"). Importantly, Internet Machines elicited testimony discrediting PLX's remaining documents establishing diligence.

Upon a review of the entirety of the record, the Court finds that substantial evidence supports the jury's finding that PLX was not the first to invent as defined by § 102(g). Reasonable and impartial minds could have reached such a verdict. *See Argo v. Woods*, 399 F. App'x 1, 3 (5th Cir. 2010) (per curiam) (explaining that the standard for determining a "Rule 50(b) motion for judgment as a matter of law following a jury verdict is whether 'the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict'" (quoting *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004))). The Court will not disturb the jury's verdict on this issue because it is supported by substantial evidence.

### 2. *Inadequate Disclosure*

Defendants also argue that the November 18, 2003 provisional application is inadequate to support a valid claim of priority for the asserted patents. Specifically, Defendants contend the provisional application lacks an adequate written description, requires a drawing, and is not enabling. Defendants reason that without a claim of priority to the provisional application, the constructive reduction to practice occurred on November 18, 2004. Therefore, Defendants believe the asserted patents are anticipated by prior invention and prior printed publication.

Specifically, the patents are anticipated by PLX's prior invention and PLX's August 26, 2003 webcast.

The written description requirement under 25 U.S.C. § 112 requires that a patent "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Therefore, "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

Defendants allege that the provisional application inadequately discloses the claimed invention. Defendants claim that the disclosure in the provisional application does not adequately demonstrate possession of the claimed invention. To the contrary, Internet Machines' technical expert Mr. Narad provided extensive testimony detailing how the provisional application supports each asserted claim. Mr. Narad mapped the claim language directly to the provisional application. Accordingly, Internet Machines provided ample evidence and testimony at trial that the written description of the provisional application reasonably conveyed to those skilled in the art that Internet Machines had possession of the claimed invention. Thus, substantial evidence supports the jury's verdict on this issue.

The requirement for drawings under 35 U.S.C. § 113 states that an "applicant shall furnish a drawing where necessary for the understanding of the subject matter sought to be patented." Defendants contend the provisional application is insufficient as a matter of law

because the inventors failed to include any drawings. Defendants' technical expert Dr. Kaliski testified that a person of ordinary skill in the art would require drawings to understand the claimed invention. Because the provisional application lacked a drawing, Defendants believe it is insufficient as a matter of law to support a claim of priority.

The law only requires a drawing "where necessary." 35 U.S.C. § 113. The lack of a drawing does not automatically defeat an application. Mr. Narad contradicted Dr. Kaliski's testimony and explained at trial that an ordinary person of skill in the art would understand the invention without a drawing. A reasonable jury was free to weigh the substantial evidence provided by Internet Machines and find that drawings were not necessary as part of the provisional application.

Defendants additionally argue that the provisional application is inadequate for claiming priority because it does not enable one of ordinary skill in the art to practice the claimed invention. Enablement under 35 U.S.C. § 112 requires that "the specification must enable one of ordinary skill in the art to practice the *claimed* invention without undue experimentation." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1355 (Fed. Cir. 2012). "Although the ultimate determination of whether one skilled in the art could make and use the claimed invention without undue experimentation is a legal one, it is based on underlying findings of fact." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005); *see also Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004) (reviewing "factual underpinnings of enablement for substantial evidence").

Defendants' technical expert Dr. Kaliski testified that the provisional application was not enabling. Yet, Dr. Kaliski did not provide extensive or thorough analysis of this issue. Rather than address the factors for addressing undue experimentation, he analogized that had one of his college students prepared such a disclosure, it would have received a poor grade. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (addressing factors for determining whether a disclosure would require undue experimentation). Internet Machines' technical expert Mr. Narad directly contradicted Dr. Kaliski's testimony. Internet Machines provided sufficient evidence to rebut Defendants' position. The jury was free to weigh the evidence and determine that Defendants did not carry their burden on this issue. Because substantial evidence supports the jury's finding on enablement, the Court finds the verdict supported.

Substantial evidence supports the jury's finding that the provisional application adequately discloses the claimed invention. Consequently, the provisional application supports the earlier priority date for the asserted patents. Therefore, Defendants' arguments concerning anticipation due to prior actual invention and prior printed publication are without merit.

### 3. *Inadequate Rule 1.131 Declaration*

Defendants maintain that Internet Machines failed to provide corroborating evidence for the inventor's Rule 1.131 declaration. Defendants assert that this renders the declaration legally insufficient. Since Internet Machines used the allegedly deficient declaration to overcome a prior art reference during prosecution, Defendants argue that the patents are anticipated under 35 U.S.C. § 102(a) by a prior publication, specifically PLX's August 26, 2003 webcast.

During patent prosecution, inventors often execute Rule 1.131 declarations to antedate a prior art reference. In doing so, the inventor "must present evidence of the actual reduction to

practice of the invention prior to the effective date of the reference." *In re NTP, Inc.*, 654 F.3d 1279, 1291 (Fed. Cir. 2011). "An inventor cannot rely on uncorroborated testimony to establish a prior invention date. It has long been the case that an inventor's allegations of earlier invention alone are insufficient—an alleged date of invention must be corroborated." *Id.*

Here, Internet Machines provided substantial evidence to support the inventor's Rule 1.131 declaration. As evidence, Internet Machines provided the documents it submitted to the patent examiner to establish an earlier priority date. This evidence includes technical documents and e-mail exchanges between engineers. Furthermore, Internet Machines' technical expert Mr. Narad testified that upon review of these documents, he believed that the inventors adequately corroborated their declarations and established an earlier priority date. Accordingly, Internet Machines provided substantial evidence to support the jury's verdict regarding corroboration of the inventors Rule 1.131 declaration.

### 4. Obviousness

Lastly, Defendants challenge the claimed invention as obvious. Defendants contend that non-transparency and PCI Express switches were both well known by persons of ordinary skill in the art at the time of the invention. Defendants argue that all of the claim elements were known at the time of the invention and that their combination is not novel or inventive. PLX's chief scientist Jack Regula testified that he did not think non-transparency was patentable because it had already been accomplished. According to Defendants, Dr. Kaliski further explained that it would have been obvious to one of ordinary skill in the art to combine non-transparent ports and PCI Express switches.

Obviousness is a legal determination based upon underlying factual findings. *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1336 (Fed. Cir. 2013). The factual findings are

based upon several factors, including "(1) the scope and content of the prior art, (2) the difference between the prior art and the claimed invention, (3) the level of ordinary skill in the field of the invention, and (4) any relevant objective considerations." *Id.*

In this case, reasonable and impartial minds could have reached a verdict of non-obviousness. Substantial facts support the jury's verdict. Based upon Defendants' limited and cursory testimony, a reasonable jury could have determined that Defendants did not establish by clear and convincing evidence that the invention would have been obvious to one of ordinary skill in the art at the time of the invention.

During trial, Defendants did not perform an element-by-element analysis of the claims for obviousness purposes. Rather than specifically identify which elements or combination of elements would have been obvious, Defendants only provided general testimony on this issue. Similarly, Internet Machines did not provide abundant testimony on non-obviousness. In reviewing the entirety of the record and in drawing all reasonable references in the non-moving party's favor, substantial evidence supports the jury's verdict. The jury was free to weigh the testimony and conclude that Defendants failed to show obviousness.

### E. **Defendants' Motion for New Trial Based on Jury Tampering (Doc. No. 544)**

This motion is **DENIED**.

Defendants contend a new trial is justified due to alleged jury tampering during trial. In rendering a verdict, "jurors must rely on only the evidence and law presented in an open court room." *Oliver v. Quarterman*, 541 F.3d 329, 340 (5th Cir. 2008). The Supreme Court clearly "prohibits jurors from being subjected to 'private communication, contact, or tampering' and considers any such external influences presumptively prejudicial." *Id.* at 335 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). "A juror is exposed to an external influence when the

juror reads information not admitted into evidence, such as a newspaper article about the case, or hears prejudicial statements from others . . . ." *Id.* at 336. Accordingly, "[j]uror exposure to extraneous information must be examined on case-by-case basis to determine if there is a reasonable probability of prejudice." *Sheehan v. Whitley*, No. 96-30008, 110 F.3d 794, at *11 (5th Cir. Mar. 11, 1997).

Here, Defendants contend a new trial is warranted because Internet Machines inadvertently exposed the jurors to extraneous and prejudicial material.

Prior to the start of the third morning of trial, the Court indicated to the parties that there was a matter that needed to be addressed before testimony resumed. The Court cleared the courtroom, but allowed counsel and the parties to remain. The Court called law clerk Ravi Deol to the witness stand for questioning. The Court placed Mr. Deol under oath for his testimony.

The Court questioned Mr. Deol about his observations in preparing the jury room that morning. Mr. Deol explained that he and court reporter Jan Mason prepared the jury room as part of their normal daily trial procedure. This procedure occurs prior to the arrival of any juror and includes filling the jury's water pitcher and making fresh coffee. Mr. Deol testified that on this particular morning, he noticed a stack of papers in the middle of the jury conference table under a tissue box. Mr. Deol observed that a jury strike list was one of the papers partially sticking out from the pile. This was unusual because the parties are required to return these lists to the Court upon the completion of jury selection.

Mr. Deol maintained the documents as discovered and presented them in court as he found them in the jury room. The Court asked a representative from each side to approach the witness to observe the documents. Lead trial counsel for Internet Machines and PLX approached. The Court then questioned the witness as to the contents of the documents in the order they were

arranged. Mr. Deol testified that the documents contained information ranging from witness testimony outlines to handwritten notes about the jurors. Plaintiff's counsel assumed responsibility for the documents. Importantly, Mr. Deol testified that "[b]ased on where [the documents] were sitting and the location of the documents, there's no indication that they had been in front of any juror or that any juror had looked at them" (Morning Trial Tr. 17:4–7, Feb. 24, 2012, Doc. No. 518). The Court permitted counsel to ask Mr. Deol or Ms. Mason any additional questions. Both sides declined.

During jury selection, the Court permitted Internet Machines' counsel to use the jury room to discuss their preemptory strikes. Internet Machines' counsel acknowledges that it left approximately 36 pages of extraneous material in the jury room after discussing its strikes.[5] These documents remained in the jury room until their discovery by Mr. Deol.

Upon the completion of Mr. Deol's testimony, Defendants moved for a new trial based upon jury tampering. Given the alleged prejudicial nature of the documents, Defendants argued that the notes by Internet Machines' counsel tainted the jury. In response, the Court called the jury into the courtroom and questioned them in front of the parties and counsel. The Court asked the jury whether any of them looked at any of the documents. Each juror indicated that they had not read any of the documents. The jurors did indicate that they collected the papers and placed them in the middle of the table. Since none of the jurors reviewed any of the documents, the Court denied Defendants' motion and resumed with trial.

Having reviewed the parties additional briefing on this issue, the Court finds no basis to depart from its original ruling. When the Court first denied Defendants' motion, neither party complained of the Court's procedure in resolving this issue. Instead, the Court's "questioning

---

[5] At one point, Internet Machines' lead counsel suggested that perhaps a cleaning person relocated the documents from the courtroom to the jury room. The Court finds this assertion completed unfounded and entirely unsupported.

reflected a careful attempt to draw the balance required by Rule 606(b), inquiring into objective events that might constitute extraneous influences on the jury, while avoiding any examination of the jury's subjective deliberation process." *Bolton v. Tesoro Petroleum Corp.*, 871 F.2d 1266, 1275 (5th Cir. 1989); *see also* Fed. R. Evid. 606(b).

Moreover, there is no reasonable possibility of prejudice in this case. Although the documents remained in the jury room for the first several days of trial, no juror ever looked at any of the material. Without having read the documents, no jurors could have been prejudiced. Even assuming the documents contained extraneous prejudicial information, they could not influence the jury based on the facts presented. Accordingly, the Court denies Defendants' request for new trial based on jury tampering.

### F.  **Defendants' Motion for New Trial Under *O2 Micro* (Doc. No. 545)**

This motion is **DENIED**.

Defendants contend that a new trial is necessary because the jury was impermissibly required to determine claim scope. Defendants argue that the parties presented competing claim constructions at trial. Specifically, Defendants allege that Internet Machines improperly argued that the non-transparent port limitation is satisfied where there are only shared address domains. The Court disagrees.

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Here, the Court does not find that Internet Machines presented a construction for the non-transparent port limitation in contradiction to the Court's construction. The Court unambiguously construed "non-transparent port" and "non-transparent interface" in its

claim construction opinion. The Court provided the jury a copy of its constructions with the jury charge and instructed the jury to apply those constructions in its deliberations.

In the briefing, Defendants mischaracterize the trial testimony Mr. Narad provided on this issue. Mr. Narad adhered to the Court's claim constructions in presenting his technical opinions at trial. Defendants' arguments are more appropriately addressed as non-infringement theories rather than issues requiring resolution under *O2 Micro*. *See supra* § III.A.

Defendants additionally argue a new trial is warranted because the Court improperly instructed the jury that "so much of your job is going to be claim interpretation and so I'm going to give you some direction on that, certain levels of interpreting the claims and in what context" (Morning Trial Tr. 18:7–10, Feb, 28, 2012, Doc. No. 522). The Court finds Defendants' argument on this point meritless. Defendants take the Court's comments out of context. The Court was not instructing the jury to determine the scope of claim language. Rather, the Court was merely explaining that the jury would necessarily have to apply the Court's claim construction as to the accused products. Shortly after this remark, the Court instructed the jury that it had interpreted the claim language and that any language not interpreted should be given its ordinary meaning as understood by one of ordinary skill in the art. Thus, the Court does not find that the jury was instructed to determine the scope of any claim language as suggested by Defendants.

Accordingly, the Court denies Defendants motion for new trial pursuant to *O2 Micro*.

### G. <u>Defendants' Renewed Motion for Judgment as a Matter of Law on Damages (Doc. No. 539)</u>

This motion is **DENIED**.

Defendants present two separate grounds for judgment as a matter of law on damages. First, Defendants contend that Internet Machines' damages expert Walter Bratic erroneously

## Add. 35

applied the entire market value rule in determining a royalty base. Second, Defendants argue that that Mr. Bratic's reliance on certain licenses to support his 6% royalty rate is improper. The Court disagrees on both grounds.

"[I]t is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287–88 (N.D.N.Y. 2009) (Rader, C.J.)). "The entire market value rule is a narrow exception to this general rule." *Id.*

Here, Mr. Bratic determined the royalty base of $16.9 million from the domestic sales of certain infringing PCI Express switches. As shown by the evidence, the switches are the smallest salable patent-practicing unit. Even though the switches are incorporated into larger computing systems, the use of switch sales as the royalty base is the smallest possible economically sound measure of damages. The use of switch sales as a royalty base is appropriate because it is "the market most aligned with the claimed invention." *Cornell Univ.*, 609 F. Supp. 2d at 287.

Defendants argue that the switches contain non-patented features, and therefore damages must be further apportioned or the entire market value rule applied. Because Mr. Bratic used the smallest salable unit as his royalty base, additional apportionment is unwarranted and the narrow exception of the entire market value rule is inapplicable. *See id.* (explaining that processers used in servers were the smallest salable patent-practicing units even though the patent covered only one component of the processors). For practical economic purposes, any further apportionment of value within a switch would be entirely speculative and arbitrary. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987) ("The determination of a

damage award is not an exact science, and the amount need not be proven with unerring precision." (quotations omitted)).

Even if the entire market value rule were applicable, the Court finds substantial evidence to show that the patented invention drove customer demand for the product. Ultimately, the Court finds there was substantial evidence to support Mr. Bratic's royalty base determination.

Defendants also argue that Mr. Bratic's 6% royalty rate is based upon improperly considered licenses. Defendants contend that the licenses covered technology not addressed by the patents. Defendants further assert that the license agreements are between parties unrelated to this litigation, and therefore, should not have been considered by Mr. Bratic in establishing a starting point for his royalty rate.

It is a general principal that "[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (per curiam); *see also* 35 U.S.C. § 284. "The trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology." *ResQNet.com*, 594 F.3d at 872–73; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317–18 (Fed. Cir. 2011).

In this case, the Court finds that Mr. Bratic properly relied upon the disputed license agreements. The testimony and evidence established that the licenses covered the same general field of technology at issue in this case: the interconnectivity among devices in a computer system. The specific technology at issue in the licenses was split bridge technology while the patented technology in the instant case dealt with transparent and non-transparent ports. Although the licenses did not directly cover the patented technology, they are sufficiently

comparable to the technology at issue in this case. These license agreements are commensurate with the technology that Defendants have appropriated in this case. Furthermore, the license agreements provide valuable and relevant information about the value of the patented technology. Accordingly, Mr. Bratic's reliance on these licensees for establishing a reasonable royalty was proper since they were "clearly linked to the economic demand for the claimed technology." *ResQNet.com*, 594 F.3d at 873; s*ee generally Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (addressing "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions" as a factor in determining a reasonable royalty).

Defendants also protest the use of the disputed license agreements because they confer greater rights than just patent licensing. Although this is correct, Mr. Bratic only considered the license agreements as a single data point in his analysis. Mr. Bratic addressed each of the *Georgia-Pacific* factors in reaching his damages opinion. *See id.* Because the licensed technology has a discernible link with the claimed invention, the Court finds that their application in this case is not speculative. Therefore, Mr. Bratic's reliance on these licensees for establishing a reasonable royalty was justifiable. In sum, the Court finds there was a sufficient evidentiary basis for Mr. Bratic's damages opinion and resulting royalty determination.

**H.** **Defendants' Motion for Remittitur or, alternatively, New Trial on Damages (Doc. No. 546)**

This motion is **DENIED**.

Defendants allege the jury's damages award is excessive and unsupported by sound economic data. Defendants again argue that Internet Machines improperly relied upon the entire market value rule and that Internet Machine's royalty rate is excessive. Accordingly, Defendants

request the Court to remit the damages to allow Internet Machines to elect a lower damages amount or a new trial on damages.

"There is a strong presumption in favor of affirming a jury award of damages." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). Remitter is appropriate only when damages are "clearly excessive." *Id.*

As previously noted, Internet Machines presented an acceptable damages model at trial. Internet Machines based its damages theory on the smallest salable patent-practicing unit and not on the entire market value rule. *See LaserDynamics*, 694 F.3d at 67 ("[I]t is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" (quoting *Cornell Univ.*, 609 F. Supp. 2d at 287–88)). Furthermore, Internet Machines adequately tied its royalty base and royalty rate to the patented technology. This is not a situation where the damages requested were entirely speculative or arbitrary. Rather, as highlighted earlier, the jury's damages award is supported by substantial evidence.

In light of the substantial evidence presented at trial, the Court finds no support for Defendants' claim that the jury's damages verdict was clearly excessive. Thus, Defendants' motion for remittitur or a new trial on damages is unavailing.

### I.   Plaintiff's Motion for an Exceptional Case Finding, for an Award of Attorneys' Fees and Expert Costs, and for Enhanced Damages (Doc. No. 549)

This motion is **DENIED**.

Internet Machines seeks a declaration that this is an exceptional case under 35 U.S.C. § 285. Thus, Internet Machines believes it is entitled to an award of attorneys' fees and expert costs. The jury awarded damages totaling $1,018,529, and Internet Machines now seeks and additional $1,863,211 in attorneys' fees. Internet Machines also seeks $150,000 in attorneys'

fees if Defendants choose to appeal this matter. Internet Machines also contends it is entitled to expert witness costs in the amount of $451,300.34.

Internet Machines additionally asserts that it is entitled to enhanced damages against PLX pursuant to 35 U.S.C. § 284. Internet Machines requests the Court treble the damages assessed against PLX from $980,340.20 to $2,941,020.60.

The Court disagrees with Internet Machines on all accounts.

### 1.  Exceptional Case: Attorneys' Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Court conducts a two-prong test in determining whether a case qualifies as exceptional under § 285. "First, the court must determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012). "If the district court finds that the case is exceptional, it must then determine whether an award of attorney fees is justified." *Id.* at 916.

Cases qualifying as exceptional under § 285 "usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in producing the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1321–22 (Fed. Cir. 2006). "However, a finding of willful infringement does not mandate that damages be increased or that attorneys fees be awarded." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1573 (Fed. Cir. 1996).

Here, Internet Machines has not demonstrated by clear and convincing evidence that this case is exceptional. First, Internet Machines maintains that this case qualifies as exceptional due

to the jury's verdict finding PLX willfully infringed the patents. As previously addressed, the Court finds that a reasonable jury could not have had a legally sufficient evidentiary basis to find for Internet Machines on this issue. Because the jury's willful infringement verdict is unsupported by the evidence, this issue is insufficient to make this case exceptional.

Internet Machines additionally contends that PLX's litigation misconduct warrants an exceptional case finding. According to the Internet Machines, PLX purposefully concealed its knowledge regarding the configuration and use of non-transparent ports by PLX's downstream customers.

Approximately one month before trial, the Court partially granted Internet Machines' motion to compel PLX to produce evidence that was allegedly wrongfully concealed during discovery. Based upon the resulting production, Internet Machines concluded that PLX attempted to conceal its knowledge of any downstream use of non-transparent ports. The Court disagreed and stated that although the produced documentation was relevant, it was unconvinced that PLX concealed evidence or provided false testimony (Doc. No. 416).

Internet Machines continues to assert its original argument regarding discovery abuses by PLX. Specifically, Internet Machines argues that the disclosure resulting from the motion to compel shows that PLX knew its customers used non-transparent ports. Internet Machines maintains this is in direct contradiction to PLX's statements that it had no knowledge of how the accused switches are used by end consumers.

PLX responds that it had an understanding what customers were trying to accomplish with the switches but that it was unaware whether specific end products or devices ultimately contained the switches in the accused configuration. Downstream customers support this assertion by stating that they have policies to provide PLX with as little information as possible

because PLX supplies market competitors with the switches. Although a customer might discuss a specific configuration with PLX, there is no indication PLX ever knew if that configuration made it to the end product. This position is entirely consistent with the statements PLX has provided throughout this litigation.

PLX also presents evidence showing that its earlier disclosures contained identical information in comparison to the compelled production. This evidence bolsters PLX's position that it worked with customers regarding the use of non-transparent ports but that it remained unaware of the actual use of the switches. Therefore, the Court finds no basis to depart from its earlier ruling that PLX has not concealed evidence or provided false testimony. Internet Machines fails to satisfy its burden on this issue. *See MarcTec*, 664 F.3d at 919 ("Litigation misconduct typically 'involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicate proceedings.'" (quoting *Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 549 (Fed. Cir. 2011)).

Internet Machines also presents several other grounds to justify an exceptional case finding. First, Internet Machines argues that PLX filed a frivolous harassment suit against Internet Machines manager Frank Knuettel. PLX originally filed a tortious interference with a membership agreement claim against Mr. Knuettel in Colorado which was subsequently transferred to this Court. PLX maintains that suit involves claims completely unrelated to this case and that none of the issues decided here would be dispositive in that litigation. Likewise, during the pretrial conference in this case, Internet Machines' counsel clearly indicated to the Court that the tortious interference action was a completely different lawsuit. In this specific instance, the Court does not classify the separately filed tortious interference suit as vexatious or unjustified litigation. The Court is unconvinced this supports an exceptional case finding.

Internet Machines additionally contends PLX engaged in discovery misconduct in relation to PLX's § 102(g) prior invention invalidity argument. During trial, Internet Machines elicited testimony from PLX's Vice President of Engineering Mr. Meduri that PLX generated a large quantity of engineering documents while reducing the invention to practice. Mr. Meduri also stated that none of the documents were brought to trial. Accordingly, Internet Machines claims this testimony was either deceitful because PLX does not actually have these documents or that PLX violated the Court's discovery order mandating production of all relevant evidence. PLX contends the voluminous engineering documents are duplicative of the documents in evidence already showing reduction to practice.

Internet Machines alleges discovery misconduct on PLX's behalf without having reviewed the alleged documents. Internet Machines provides no evidence to contradict PLX's assertion that the documents are duplicative of already produced material. Importantly, Internet Machines raised this issue with Mr. Meduri into order to undercut PLX's prior invention argument.

From the trial testimony, it appears that Internet Machines was fully aware these engineering documents existed. But there is no evidence that Internet Machines ever requested these documents from PLX after realizing their existence. Additionally, Internet Machines never moved for the Court to compel any engineering documents even after it became aware of PLX's § 102(g) argument. The Court will not now allow Internet Machines to benefit from the nonproduction of these documents when they had the ability to timely seek them. The Court does not find that this alleged deficient production is clear and convincing proof that this case is exceptional.

Overall, Internet Machines has not established by clear and convincing evidence that this is an exceptional case under § 285. Neither the jury's unsupported willful infringement verdict nor PLX's alleged litigation misconduct adequately supports an exceptional case finding. Additionally, PLX's tortious interference suit and alleged deficient production are likewise insufficient to establish this case as exceptional. Because Internet Machines fails to meet the first part of the exceptional case test, the Court need not address the subsequent prong. Accordingly, the Court concludes that attorneys' fees under § 285 are unwarranted.

### 2. *Exceptional Case: Expert Costs*

In addition to attorneys' fees, Internet Machines seeks to recover $451,300.34 in expert witness expenses. It is within the Court's "inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008). "Use of this inherent authority is reserved for cases where the district court makes a finding of fraud or bad faith whereby the very temple of justice has been defiled." *MarcTec*, 664 F.3d at 921 (quotations omitted). "Accordingly, not every case that qualifies as exceptional under § 285 will also qualify for sanctions under the court's inherent power." *Id.*

Internet Machines contends it is entitled to expert costs in order to be made whole. Internet Machines also alleges that its expert had to issue additional reports after the Court ordered PLX to produce additional documents. Furthermore, Internet Machines alleges that its technical expert Mr. Narad underwent an additional deposition after issuing his supplemental report. Internet Machines believes these factors justify an award of expert witness expenses. The Court does not find Internet Machines' arguments persuasive.

As set forth above, the record does not support an exceptional case finding under § 285. Moreover, there is no evidence that this case involves fraud or bad faith. In exercising its discretion, the Court declines to award Internet Machines expert witness expenses.

### 3. *Enhanced Damages*

Internet Machines argues it is entitled to trebled damages based upon the jury's willful infringement verdict. Pursuant to 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed" by the jury. But "[a] finding of willful infringement is a prerequisite to the award of enhanced damages." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010). As previously discussed, the Court does not find the jury's willfulness verdict supported by legally sufficient evidentiary basis. *See supra* § III.C. Because the Court finds no willful infringement, there can be no enhanced damages. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc). ("[A] finding of willfulness does not require an award of enhanced damages; it merely permits it.").

### J. <u>Plaintiff's Motion for an Award of Post-Verdict Royalties (Doc. No. 550)</u>

This motion is **GRANTED IN PART**.

Internet Machines seeks an award of a post-verdict running royalty in the amount of 10% of the total sales for any infringing switch. At trial, the jury awarded damages consistent with the damages model presented by Internet Machines' damages expert Mr. Bratic. Mr. Bratic testified to a 6% royalty rate. Internet Machines now argues that based upon the parties' changed circumstances, an increased post-verdict royalty rate is warranted. Defendants reiterate their objections to Internet Machines' damages model and presents an alternative post-verdict running royalty amount. Defendants argue that the damages model its expert presented at trial more accurately reflects future damages. Accordingly, Defendants state that ongoing running royalties

should equal the number of switches sold, times a royalty rate of $0.26, times 0.05 to appropriately apportion the damages to the infringing feature.

Although the parties do not distinguish between post-verdict damages and post-judgment damages, the Court finds it prudent to address them independently.

### 1.  Post-Verdict Damages

Internet Machines requests an increased running royalty for all post-verdict sales. Internet Machines argues this in part because of the jury's willful infringement finding against PLX. But as previously addressed, the Court vacates the jury's willful infringement verdict as unsupported by substantial evidence. Thus, the Court does not find that an increased royalty rate for post-verdict, prejudgment damages based upon willful infringement is unjustified.

The Court finds the royalty rate pursuant to the jury's verdict as the appropriate starting point. *See Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 645–46 (E.D. Tex. 2011). Neither party presents any evidence relevant to this time period that would suggest increasing or decreasing this rate. Accordingly, the Court finds that a running royalty in the amount of 6% of the total sales of any infringing switch is appropriate to assess post-verdict, prejudgment damages in this case.

### 2.  Post-Judgment Damages

"Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate." *Paice LLC v Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007). In awarding post-judgment damages, "the court must consider the change in the legal relationship between the parties to avoid incentivizing defendants 'to fight each patent infringement case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing.'" *Fractus, S.A. v. Samsung Elecs. Co., Ltd.*, 876 F.

Supp. 2d 802, 855 (E.D. Tex. 2012) (quoting *Paice, LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d

620, 628 (E.D. Tex. 2009)). Accordingly, "pre-suit and post-judgment acts of infringement are

distinct, and may warrant different royalty rates given the change in the parties' legal

relationship and other factors." *Paice LLC.*, 504 F.3d at 1317 (Rader, C.J., concurring).

Importantly, courts must "provide a concise but clear explanation of its reasons for the fee

award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

   In instances where a court finds a permanent injunction unfounded, the court may want

"to allow the parties to negotiate a license amongst themselves regarding future use of a patented

invention before imposing an ongoing royalty. Should the parties fail to come to an agreement,

the district court could step in to assess a reasonable royalty in light of the ongoing

infringement." *Paice LLC*, 504 F.3d at 1315.

   After the jury rendered its verdict in this case, the Court instructed the parties to conduct

a mediation "[i]n an effort to reach a business solution in a timely and efficient manner" (Doc.

No. 509). The mediation resulted in an impasse. Since the parties were unable to resolve the

issue of ongoing royalties themselves, the Court finds it proper to now address this issue.

   Although the Federal Circuit has not settled on the exact procedure for determining post-

judgment damages, the Court finds the procedure outlined in *Mondis* instructive. *See Mondis*

*Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 646 (E.D. Tex. 2011). The appropriate

starting point for determining post-judgment damages lies with the jury's verdict. *Id.* The Court

will then address any changed circumstances in light of the *Georgia-Pacific* factors. *Id.*

Thereafter, the Court determines whether the continued infringement is willful and calls for

enhanced damages. *Id.*

Here, the jury awarded pre-verdict damages as 6% of total sales of infringing switches. The Court finds this as an appropriate baseline for determining post-judgment royalties.

The Court next addresses the parties changed circumstances in light of the *Georgia-Pacific* factors. Internet Machines points to numerous documents and testimony from trial in arguing that a number of the factors strongly suggest an increase is warranted in the royalty rate. But all of the evidence Internet Machines points out was previously before the jury and considered at the time the jury addressed damages. This evidence provides no insight into the parties' subsequent changed circumstances.

The only new information provided by Internet Machines is a letter dated 13 days after trial from Simon Michael to PLX's board of directors. Mr. Michael is the manager of a nearly 10% shareholder of PLX. In the letter, Mr. Michael is critical of PLX's growth strategy and claims that a series of acquisitions has destroyed shareholder wealth. Mr. Michael urges PLX to focus on improving its valuable PCI Express switch business. Internet Machines argues that the accused feature increasingly appears on PLX's switches and is therefore probative evidence of the value of the use of the invention. *See Georgia-Pacific*, *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (outlining as an 11th factor "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use").

The Court does not find that the assertions in Mr. Michael's letter warrant an increased royalty rate. Although the letter touts the value of PLX's switch business, it does not address the value of the asserted invention. Internet Machines' conclusion that the asserted invention is the foundation of Mr. Michael's comments is unsupported. Accordingly, the Court does not find that this letter positively impacts the royalty rate as suggested by Internet Machines.

Defendants do not present any evidence of the parties' changed circumstances. Rather, Defendants continue to discredit Internet Machines' damages model. Defendants insist that their damages model is superior because it apportions damages to the accused functionality. As previously noted, the Court rejects Defendants' contention that Internet Machines improperly calculated damages. Based on the evidence presented by both parties, the Court does not find that Defendants' damages model is a more reliable or accurate forecast for post-judgment damages.

In relying upon the *Georgia-Pacific* factors, the Court finds no basis to depart from the reasonably running royalty that serves as the foundation of the jury's verdict. Next, the Court must assess whether enhanced damages are justified.

"Following a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances." *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 899 (E.D. Tex. 2011); *see also Mondis*, 822 F. Supp. 2d at 649. In determining whether enhanced damages are appropriate, the Court looks to the *Read* factors. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–78 (Fed. Cir. 1995) (en banc). These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Id.*

The first *Read* factor is neutral because the Court finds no evidence of intentional copying. The second and fifth *Read* factors weigh heavily in favor of an enhanced ongoing royalty. Because the jury found that Defendants infringe valid patents, they cannot now claim in good faith defenses regarding either non-infringement or invalidity. The third *Read* factor is neutral since, as previously stated, the Court does not find Defendants engaged in any litigation misconduct.

The fourth *Read* factor is neutral. Defendants are large companies while Internet Machines is considerably smaller by comparison. This alone would balance in favor of enhanced royalties. But not all of the Defendants are in financially healthy conditions. Internet Machines alleges PLX's revenue and gross profit figures for 2010 and 2011 indicate PLX is capable of absorbing enhanced damages. Yet, PLX's public financial disclosures more accurately reflect that PLX's operations have experienced net losses over the past several years. Although there can be legitimate business explanations for running net losses, neither party asserts them here. Ultimately, the Court finds that PLX would be capable of paying enhanced damages going forward. But out of an abundance of caution in regards to PLX's financial decline, the Court finds this factor neutral.

The sixth and seventh *Read* factors strongly weigh in favor of enhanced post-judgment damages. At this point, it is unclear how long Defendants would continue infringement. But PLX states it would cease providing the infringing functionality within three months of a final non-appealable judgment. This actually suggests that a high enhancement rate would be appropriate because Defendants could so easily cease infringement. Furthermore, Defendants have taken no actions to avoid infringement. Overall, the Court finds these factors further justify an enhanced royalty rate.

## Add. 50

The eight *Read* factor concerning Defendants' motivation for harm is neutral. There has been no evidence that Defendants' infringement is motivated by a desire to harm Internet Machines or otherwise force it out of business. Similarly, the last *Read* factor is also neutral. The Court does not find that Defendants attempted to conceal their infringement.

The Court finds that Defendants post-judgment infringement of the valid patents is willful. In balancing the *Read* factors, the Court concludes an enhanced post-judgment royalty rate is substantiated. In this particular circumstance, the Court finds a 50% increase in the royalty rate appropriate. Thus, Internet Machines is entitled to a post-judgment royalty of 9% of the sales of any infringing switches.

### K. Plaintiff's Amended Motion for Award of Costs (Doc. No. 556)

This motion is **GRANTED**.

Internet Machines additionally requests an award of costs as the prevailing party. Defendants object to the timing of Internet Machines' request. Because Defendants are contesting the jury's verdict, they believe Internet Machines' motion is more properly addressed after the entry of final judgment. Even though Defendants believe the request is premature, Defendants do not object to the specific amount sought as costs.

The Court finds no reason to delay addressing this issue. Pursuant to Federal Rule of Civil Procedure 54(d)(1), a prevailing party is generally awarded costs of court as a matter of course. In this case, Internet Machines is the prevailing party. Accordingly, the Court awards costs to Internet Machines in the amount of $78,661.25.

### L. Plaintiff's Motion for Pre and Post-Judgment Interest (Doc. No. 548)

This motion is **GRANTED**.

Internet Machines now moves for prejudgment and post-judgment interest. The Court addresses each in turn.

### 1. *Prejudgment Interest*

Internet Machines requests an award of prejudgment interest at the annual prime interest rate compounded quarterly. Conversely, Defendants believe it is more accurate to calculate prejudgment interest at the Treasury bill (T-Bill) rate[6] or the 10-year Treasury rate, and that the interest should be compounded annually.

Courts freely award prejudgment interest absent significant justifications, which may include delay in filing suit. *See Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) ("The award of pre-judgment interest is 'the rule not the exception.'" (quoting *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1177 (Fed. Cir. 2011)). Courts retain broad discretion in determining prejudgment interest, including the appropriate rate and compounding frequency. *See Fractus, S.A. v. Samsung Elecs. Co., Ltd.*, 876 F. Supp. 2d 802, 855 (E.D. Tex. 2012). "An award of prejudgment interest carries out Congress's 'overriding purpose of affording patent owners complete compensation' since a patentee's damages also include the 'forgone use of the money between the time of infringement and the date of judgment.'" *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 36 (Fed. Cir. 2012) (quoting *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56 (1983)).

Here, Internet Machines did not delay in enforcing its rights and there is no other rational for disallowing an interest award. Accordingly, prejudgment interest is appropriate. In this case, the Court finds the prime interest rate better approximates Internet Machines' foregone investment opportunity. Accordingly, the Court awards Internet Machines prejudgment interest

---

[6] Although PLX states that the T-bill rate is an appropriate measure, it does not indicate what maturity period is appropriate. T-bills commonly have maturities of four weeks, 13 weeks, 26 weeks, or 52 weeks. The return rates vary for each of these maturity periods.

Add. 52

at the prime interest rate in effect as of the date of this order, compounded quarterly. This interest is to be calculated from the date of first infringement through the date of final judgment.

   *2.  Post-Judgment Interest*

   Defendants acknowledge that if Internet Machines prevails in this action, it is entitled to post-judgment interest at the lawful federal rate pursuant to 28 U.S.C. § 1961. The Court agrees and awards Internet Machines post-judgment interest at the lawful federal rate in effect as of the date of this order.

   **M.  Plaintiff's Motion for Entry of Judgment (Doc. No. 547)**

   This motion is **GRANTED IN PART** as reflected in the Court's contemporaneously issued final judgment.

   **IV.    CONCLUSION**

   For the forgoing reasons, the Court enters the above rulings on the parties' post-trial motions.

   **It is SO ORDERED.**

   **SIGNED this 19th day of June, 2013.**


_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

**Add. 53**

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

Oct 7, 2013

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Jay F. Utley

Name of Counsel

/s/ Jay F. Utley

Signature of Counsel

Law Firm    Baker & McKenzie LLP

Address    2001 Ross Avenue, Suite 2300

City, State, ZIP    Dallas, Texas 75201

Telephone Number    214-978-3000

FAX Number    214-978-3099

E-mail Address    jay.utley@bakermckenzie.co

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

**Form 19**

FORM 19.   Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑      The brief contains [          *13,976*          ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐      The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑      The brief has been prepared in a proportionally spaced typeface using [          *Microsoft Word 2000*          ] in [          *14 point Times New Roman*          ], or

☐      The brief has been prepared in a monospaced typeface using [                              ] with [ [                              ].

/s/ Jay F. Utley
_____
(Signature of Attorney)

Jay F. Utley
_____
(Name of Attorney)

Defendants-Appellants
_____
(State whether representing appellant, appellee, etc.)

October 7, 2013
_____
(Date)

Reset Fields

142